[Cite as *Brandt v. Pompa*, 2021-Ohio-845.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

AMANDA BRANDT,                                    :

    Plaintiff-Appellant,             :

                                             No. 109517

v.                                               :

ROY POMPA, ET AL.,                               :

    Defendants-Appellees.            :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 18, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-18-899352

---

***Appearances:***

The Fitch Law Firm, John K. Fitch, and Kirstin A. Peterson, *for appellant*

Samuel R. Smith II, *for appellees*.

KATHLEEN ANN KEOUGH, J.:

{¶ 1}   Plaintiff-appellant, Amanda Brandt, appeals from the trial court's judgment that reduced the jury verdict for noneconomic damages pursuant to R.C. 2315.18.  Brandt contends that as applied to her, a victim of sexual abuse as a minor,

R.C. 2315.18 is unconstitutional.  For the reasons that follow, we affirm the trial court's judgment.

## I.  Background

{¶ 2}  From 2002 to 2006, defendant-appellee Roy Pompa molested and sexually assaulted numerous female children in his home.  He molested Brandt, who was age 11 and 12 during the abuse, in 2004 and 2005.  Brandt was a friend of one of Pompa's daughters and would often spend the night at the Pompas' home.  On many occasions, Pompa put illicit substances in Brandt's drinks before she went to sleep in order to commit sexual acts against her without her knowing or being fully aware.

{¶ 3}  Pompa recorded many of these acts, which were uncovered following several searches of Pompa's home initiated by the Ohio Internet Crimes Against Children Task Force and the Brook Park police.  *State v. Pompa*, 8th Dist. Cuyahoga No. 90110, 2008-Ohio-3672, ¶ 2-3.  Pompa also possessed child pornography depicting  children as young as three being sexually abused by adults.

{¶ 4}  Pompa was arrested and convicted of 17 counts of rape, 5 counts of kidnapping, 55 counts of pandering sexually oriented matter involving a minor, 21 counts of gross sexual imposition, and possession of criminal tools, among other convictions, and sentenced to life in prison.  *Pompa* at ¶ 7, 9.

{¶ 5}  In 2018, Brandt filed a complaint against Pompa, asserting claims for intentional criminal wrongdoing, knowing dissemination of child pornography, and intentional infliction of emotional distress.  Brandt also asserted a claim for

declaratory judgment that as applied to the facts of her case, R.C. 2315.18 is unconstitutional.[1]

## II.  Trial Testimony

{¶ 6}  At trial, the jury heard the parties' stipulation regarding Pompa's convictions for his offenses against Brandt, which included 34 instances of abuse that occurred from May 2004 to November 2005.  The jury also watched Pompa's videotaped deposition, in which he admitted that he recorded incidents involving his sexual abuse of Brandt on at least eight occasions.

{¶ 7}  Brandt's mother testified that prior to the abuse, Brandt was "a beautiful, happy-go-lucky friend to everyone" who "wanted to conquer the world," but after the abuse, she "never wanted to go anywhere" and "just wanted to be alone."  She testified further that the abuse "totally changed" her daughter, and that she does "not have the same daughter anymore."  She explained that Brandt "has a lot of anger [and] anxiety issues," and that she "just is not the same kid that we knew growing up and even into her adulthood."

{¶ 8}  Brandt, who was 26 years old at trial, testified that prior to the abuse, she had a "pretty normal" childhood.  She testified that the Pompas lived about a mile away from her house, and their youngest daughter was her best friend growing up.  She said she often went to the Pompas' house for sleepovers, and that during these sleepovers, before she went to bed, Pompa would give her already-opened

---

[1] Brandt also asserted claims for negligence and willful, wanton, and reckless misconduct against Pompa's ex-wife, which were settled before trial.

juice boxes, iced tea, or water laced with illicit drugs that left her feeling groggy when she woke up. Brandt testified that despite being drugged, she could recall some instances of abuse, including one where she woke thinking a cat was rubbing against her but then realized it was a hand rubbing her vagina.

{¶ 9} Brandt read for the jury a letter she had written to the trial judge in Pompa's criminal trial before his sentencing. In the letter, written when Brandt was twelve years old, Brandt told the judge that she had been involved in many activities before the abuse, but now did not want to go anywhere. She said the abuse had caused "serious emotional problems" for her, and as a result, she was seeing a counselor, sometimes multiple times each week. She said she had lost her best friend as a result of the abuse and had difficulty sleeping, and her grades had dropped because she was always distracted. She asked that Pompa be given the death penalty.

{¶ 10} Brandt testified that she was a "very angry kid" after the abuse, and had "a lot of breakdowns" that required counseling. She said she began counseling immediately after her family learned of the abuse, had seen numerous counselors over the years, and was "still in counseling to this day." Brandt said she hopes to someday not need counseling "but that's not even on the radar right now."

{¶ 11} Brandt testified that she suffers from "constant nightmares" that began during the abuse but still continue and make it difficult for her to function during the day because she does not get enough sleep. She said she takes medication

to help with the nightmares but still has them at least five times a week. She said a majority of the nightmares involve her being trapped in Pompa's house.

{¶ 12} Brandt testified that she suffers from PTSD and anxiety issues that she attributes to the abuse. She said she gets anxiety attacks if she is in large groups of people, so she does her grocery shopping at Walmart at 2 or 3 a.m. because not many people are there at that time. She said that she can no longer be in nightclubs, perform community service, or go to concerts for the same reason. She said she currently takes Zoloft to help with her mood and depression, and that she had taken numerous other drugs over the years "trying to get this under control."

{¶ 13} Brandt testified that after graduating high school in 2011, she found a job working full time in a customer call center and moved into her own apartment. She said she initially did well at the job, but was terminated after a few years because her anxiety had increased, making it difficult for her to fulfill the job requirements. Brandt then obtained a door-to-door sales job at which she met a coworker who was a heroin addict. Brandt said she began using heroin at the coworker's encouragement that it would make her feel better, which led to her drug addiction.

{¶ 14} The door-to-door sales job did not work out, and Brandt could no longer afford her apartment. Brandt said she met a man online who lived in Michigan, and decided to move there to live with him because she "liked the idea of being able to go somewhere and make a life for myself." Brandt testified "that wasn't a great plan" because he was homeless and a drug addict. She and the man lived in a tent for approximately a year.

{¶ 15} Brandt said she eventually decided she "was done living like this" and moved back in with her parents for a few months. She said her mental health continued to worsen, however, and she tried to commit suicide by overdosing on heroin. Upon her discharge from the hospital, she began attending Narcotics Anonymous meetings, and at the time of trial, had been clean for six years.

{¶ 16} Brandt met her husband six months after she became sober. They lived together and eventually married, and have two young children. Brandt testified that although she works part-time as a waitress, she has completed the necessary classes to obtain to her real estate license and hopes to start a career in real estate.

{¶ 17} The jury watched the videotaped deposition of Brandt's expert, Dr. Patrick Yingling, a clinical psychologist, who evaluated Brandt in June 2019. Dr Yingling took a history from Brandt and administered the Minnesota Multiphasic Personality Inventory. In light of her responses to the test and his review of medical records and other documents, Dr. Yingling opined that Brandt suffers from PTSD as a result of Pompa's sexual abuse. He further opined that her symptoms would continue "with some degree of intensity" for a "significant" period of time and that she would benefit from ongoing psychotherapy and medications.

{¶ 18} On cross-examination, Dr. Yingling conceded there was "an indication" in Brandt's deposition that "there was a family history of substance abuse issues." He further conceded that the medical records he reviewed indicated that Brandt attempted suicide more than once, but that she mentioned only one

attempt to him. Dr. Yingling testified further that he had observed in the medical records that at least one other of Brandt's family members had attempted suicide, but Brandt did not mention this to him.

{¶ 19} Dr. Yingling also conceded that the medical records indicated that Brandt had had an abusive boyfriend, but she did not tell him about that relationship. He testified that it would be important to know about an abusive relationship when diagnosing PTSD because such a relationship can contribute to PTSD. Dr. Yingling admitted that he does not dispute that homelessness can lead to PTSD, and that a heroin overdose could "cause or contribute to" a diagnosis of PTSD. Dr. Yingling further admitted that an individual's relationship with their parents, siblings, and extended family can be important to a diagnosis of PTSD, but conceded that he did not "specifically ask with that level of detail about [Brandt's] family history." Dr. Yingling also testified that it impossible to know "the precise moment" when Brandt "officially had PTSD" or how long her symptoms will continue. Finally, he admitted that any questioning of Brandt about the sexual abuse outside of a therapeutic setting — such as her testimony at Pompa's criminal trial — could lead to an increase in the intensity of her symptoms.

{¶ 20} The jury returned a verdict for Brandt for compensatory damages of $14 million for noneconomic damages incurred prior to April 6, 2005, (the effective date of R.C. 2325.18), $20 million for noneconomic damages occurring after April 6, 2005, and $100 million in punitive damages. The trial court subsequently granted Pompa's post-trial request to cap the amount of noneconomic damages

occurring after April 6, 2005, pursuant to R.C. 2315.18 on the authority of *Simpkins v. Grace Brethren Church of Delaware*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, and reduced those damages to $250,000. This appeal followed.

## III. Law and Analysis

{¶ 21} Under R.C. 2315.18(B)(2),

> the amount of compensatory damages that represents damages for noneconomic loss * * * shall not exceed the greater of two hundred fifty thousand dollars or an amount that is equal to three times the economic loss, as determined by the trier of fact, of the plaintiff in that tort action to a maximum of three hundred fifty thousand dollars for each plaintiff in that tort action or a maximum of five hundred thousand dollars for each occurrence that is the basis of that tort action.

{¶ 22} The damage caps on noneconomic loss do not apply when the noneconomic loss is for "[p]ermanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system" or for "[p]ermanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities." R.C. 2315.18(B)(1) and (b).

{¶ 23} In her first assignment of error, Brandt contends that the trial court erred in granting Pompa's motion to reduce the monetary amount of her recovery for noneconomic damages occurring after April 6, 2005, pursuant to R.C. 2315.18. She argues that as applied to the facts of this case, R.C. 2315.18 violates her constitutional rights to a jury trial, open courts and a remedy, equal protection, and due process of law.

{¶ 24} There are two ways to challenge the constitutionality of a statute.

> A party may challenge the constitutionality of a statute with either a facial challenge or an as-applied challenge. A facial challenge asserts that there is no conceivable set of circumstances in which the statute would be valid. An as-applied challenge, on the other hand, alleges that application of the statute in a particular factual context is unconstitutional. A holding that a statute is unconstitutional as applied prevents future application of the statute in a similar context, but it does not render the statute wholly inoperative.

(Citations omitted.) *Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, at ¶ 20.

{¶ 25} A party raising an as-applied constitutional challenge must prove by clear and convincing evidence that the statute is unconstitutional when applied to an existing set of facts. *Groch v. Gen. Motors Corp.*, 117 Ohio St.3d 192, 2008-Ohio-546, 883 N.E.2d 377, ¶ 181. When addressing constitutional challenges, we remain mindful that all statutes have a strong presumption of constitutionality. *Simpkins* at ¶ 22, citing *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 25. Thus, "if at all possible, statutes must be construed in conformity with the Ohio and the United States Constitutions." *State v. Collier*, 62 Ohio St.3d 267, 269, 581 N.E.2d 552 (1991).

{¶ 26} In *Simpkins*, the Ohio Supreme Court considered whether, as applied to damages awarded to minors who are victims of sexual assault, R.C. 2315.18 violates the constitutional rights afforded by the Ohio Constitution to trial by jury, open courts and a remedy, due process of law, and equal protection. *Id.* at ¶ 19. Relying on its decision in *Arbino*, in which the court rejected facial constitutional challenges to R.C. 2315.18 on the same grounds, the *Simpkins* court held that R.C.

2315.18 was constitutional as applied to the facts before it. *Id.* at ¶ 1. The court noted that "there may exist a set of facts under which application of the statutory damage caps would prove unconstitutional," but found that the *Simpkins* case did not present such facts. *Id.* at ¶ 51.

{¶ 27} Brandt argues that this is such a case. She concedes that there are some factual similarities between her case and *Simpkins*, but asserts that the egregious nature of her abuse, coupled with the devastating impact the abuse has had on her life, distinguishes her case from *Simpkins*. Upon considering the factual circumstances of this case as applied to the constitutional rights of trial by jury, open courts and a remedy, due process, and equal protection, we find no reason to reach a different result in this case than that in *Simpkins*.

## A. Trial by Jury

{¶ 28} Article I, Section 5 of the Ohio Constitution states that "[t]he right of trial by jury shall be inviolate." Article I, Section 5 "protects a plaintiff's right to have a jury determine all issues of fact," including the extent of the plaintiff's damages. *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 34. Brandt contends that the damage caps in R.C. 2315.18 violate the fundamental right to trial by jury.

{¶ 29} The Ohio Supreme Court considered the same argument in *Simpkins* and concluded that "our analysis in *Arbino* requires us to reject that argument." *Simpkins* at ¶ 23. Citing to *Arbino*, the court stated:

> A law that prevents the jury from determining issues of fact or that allows a judge to substitute his or her own findings of fact for those of

the jury is unconstitutional. But a trial court may alter an award of damages as a matter of law "[s]o long as the fact-finding process is not intruded upon and the resulting findings of fact are not ignored or replaced by another body's findings. R.C. 2315.18 neither precludes the jury from determining factual issues nor permits the court to substitute its own findings of fact. Rather, courts "simply apply the limits as a matter of law to the facts found by the jury."

(Citations omitted.) *Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, at ¶ 24.

{¶ 30} Just as the plaintiff in *Simpkins*, Brandt argues that as applied to her damages, R.C. 2315.18(B)(2) alters the jury's finding that she suffered a catastrophic injury commensurate with those designated in R.C. 2315.18(B)(3). But as the *Simpkins* court concluded, "even characterizing the jury's damage award as a finding that [the victim] suffered catastrophic injuries commensurate with those designated in R.C. 2315.18(B)(3), the trial court simply applied the law to the facts, as determined by the jury." *Id.* at ¶ 25. Further, "application of the damage caps does not affect [the victim's] right to a jury trial any differently than it affects any tort claimant whose damages are capped as a matter of law." *Id.*

{¶ 31} Brandt asserts that the majority holding in *Arbino* that the statute does not alter a jury's findings of fact, upon which the *Simpkins* court relied in reaching its decision, "renders the fact finding function of the jury meaningless and was wrongly decided." This court, however, as an intermediate court, is bound by and must follow and apply the decisions of the Ohio Supreme Court. *Gehad & Mandi, Inc. v. Ohio State Liquor Control Commn.*, 10th Dist. Franklin No. 05AP-

1181, 2006-Ohio-3081, ¶ 7. "This court has no authority to modify, and much less to overrule, any decision of the Ohio Supreme Court." *Id.*

{¶ 32} Accordingly, because Brandt makes the same arguments considered and rejected in *Simpkins* regarding R.C. 2315.18 and the constitutional right to trial by jury, we find that she has not demonstrated by clear and convincing evidence that R.C. 2315.18 violates the right to trial by jury when applied to the facts of this case.

## B.  Open Courts and Right to Remedy

{¶ 33} Article I, Section 16 of the Ohio Constitution provides that "[a]ll courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."  In *Arbino*, the court found that the right to open courts and a remedy means "'an opportunity granted at a meaningful time and in a meaningful manner.'"  *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 44, quoting *Hardy v. VerMeulen*, 32 Ohio St.3d 45, 47, 512 N.E.2d 626 (1987).

{¶ 34} Brandt contends that the reduction of the jury's award of noneconomic damages from $20 million to $250,000 pursuant to R.C. 2315.18 violates her constitutional rights to open courts and a remedy by denying her a "meaningful" remedy.  The plaintiff in *Simpkins* raised the same argument, and the court found that its holding in *Arbino* required it to reject this argument.  The court stated:

> This court has recognized that the rights to open courts and a remedy become hollow when an individual is wholly foreclosed from relief after

a verdict in his favor. *Arbino* at ¶ 45. But although R.C. 2315.18 limits the amount of noneconomic damages that a plaintiff may recover, it does not "wholly deny persons a remedy for their injuries." *Id.* at ¶ 47. And the types of damages that remain available to plaintiffs — unlimited economic damages, up to $350,000 in noneconomic damages, and punitive damages — are meaningful remedies under the Ohio Constitution. *Id.*

*Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, at ¶ 30.

{¶ 35} The court further found that R.C. 2315.18(B)(2) does not affect a minor victim of sexual abuse any differently than any other plaintiff and, further, that "neither the amount of the reduction of noneconomic damages nor appellants' assertion that minors who are victims of sexual assault will generally have noneconomic damages that far outweigh their economic damages demonstrates that those victims are denied a meaningful remedy." *Id.* at ¶ 31. Brandt raises the same arguments here, and we reject them on the basis of *Simpkins*.

{¶ 36} Brandt also argues, as did the plaintiff in *Simpkins*, that application of R.C. 2315.18 violates her rights to open courts and a remedy because she has incurred significant litigation expenses and attorney fees. The *Simpkins* court rejected this argument, stating that "[a]ppellants are not unique in that regard, however, and the impact of litigation expenses and attorney fees does not render the available remedies unmeaningful." *Id.* at ¶ 32. We further note that the trial court awarded Brandt attorney fees of $194,920.00 and litigation expenses of $11,941.43.

{¶ 37} Because Brandt raises the same arguments regarding open courts and a remedy that were addressed and rejected in *Simpkins*, we find that she has not

proven by clear and convincing evidence that application of R.C. 2315.18 to the facts of this case violates her constitutional rights to open courts and a remedy.

### C. Due Process of Law

{¶ 38} Brandt also contends that as applied to her, R.C. 2315.18 violates the "due course of law" provision in Article I, Section 16 of the Ohio Constitution. This clause has generally been recognized as the equivalent of the Due Process Clause in the United States Constitution. *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 48, citing *Sorrell v. Thevenir*, 69 Ohio St.3d 415, 422-423, 633 N.E.2d 504 (1994), citing *Direct Plumbing Supply Co. v. Dayton*, 138 Ohio St. 540, 544, 38 N.E.2d 70 (1941).

{¶ 39} When reviewing a statute on due-process grounds, we apply a rational-basis test unless the statute restricts the exercise of fundamental rights. *Arbino* at ¶ 49, citing *Morris,* 61 Ohio St.3d at 688-689, 576 N.E.2d 765; *Sorrell* at 423. As in *Simpkins* and *Arbino,* having found that R.C. 2315.18 does not violate Brandt's fundamental rights to a jury trial or to open courts and a remedy, we apply the rational-basis test to our due-process analysis. Under the rational-basis test, a statute must be upheld if it bears a real and substantial relation to the public health, safety, morals, or general welfare of the public and is not unreasonable or arbitrary. *Arbino* at ¶ 49.

{¶ 40} In *Arbino*, the court found that R.C. 2315.18 "bears a real and substantial relation to the general welfare of the public." *Id.* at ¶ 55. The court reasoned that before enacting R.C. 2315.18,

> [t]he General Assembly reviewed evidence demonstrating that uncertainty related to the existing civil litigation system and rising costs associated with it were harming the economy. It noted that noneconomic damages are inherently subjective and thus easily tainted by irrelevant considerations. The implicit, logical conclusion is that the uncertain and subjective system of evaluating noneconomic damages was contributing to the deleterious economic effects of the tort system.

*Id.*

{¶ 41} Brandt raises the same argument asserted by the appellants in *Simpkins*, i.e., that R.C. 2315.18, as applied to minors who are victims of sexual assault, does not bear a real and substantial relation to the general public welfare because "those victims rarely suffer significant economic injury and will typically not suffer the types of injuries required by R.C. 2315.18(B)(3) to avoid application of the damage caps." *Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, at ¶ 38. The court rejected this argument, however, reasoning that "the status of a plaintiff does not diminish either the economic benefits of limiting noneconomic damages, as found by the General Assembly, or the substantial relationship that we found in *Arbino* between the statutory limitations and the benefits to the general public welfare." *Id.*

{¶ 42} Brandt next contends that R.C. 2315.18 is arbitrary and unreasonable as applied. She argues that because minors who are victims of sexual assault typically suffer serious psychological harm, as opposed to serious physical injury or pecuniary harm, "it is clearly irrational to require that they suffer a physical injury of the kind listed in R.C. 2315.18(B)(3) before they can receive the amount of compensatory damages awarded by the jury." She further contends that the

psychological damage suffered by minors who are victims of sexual abuse is catastrophic, such that it is arbitrary and unreasonable to impose on her and others similarly situated "the high cost of ameliorating the perceived 'deleterious economic effects of the tort system.'"

{¶ 43} These arguments were likewise considered and rejected in *Simpkins*. The court reasoned:

> Although damages awarded to minors who are victims of sexual assault may be unlikely to qualify for an exception to the application of the noneconomic-damage caps, the General Assembly's policy decision to exclude from the damage caps only those awards to plaintiffs who suffer catastrophic *physical* damages does not place upon Simpkins and those similarly situated an undue portion of the cost of ameliorating the deleterious economic effects of the tort system * * *.
>
> * * * Appellants' as-applied challenge essentially asserts that the General Assembly acted unreasonably and arbitrarily by distinguishing between catastrophic physical and catastrophic nonphysical injuries for purposes of applying caps on noneconomic damages. But in *Arbino,* we held that the General Assembly distinguished between plaintiffs who suffered catastrophic physical injuries specified in R.C. 2315.18(B)(3) and plaintiffs suffering other injuries based on the conclusion that the injuries specified in R.C. 2315.18(B)(3) "offer more concrete evidence of noneconomic damages and thus calculation of those damages poses a lesser risk of being tainted by improper external considerations." *Arbino* at ¶ 72. In the end, R.C. 2315.18 does not affect Simpkins any differently than it affects any other victim whose injuries do not fall within the R.C. 2315.18(B)(3) exceptions to the damage caps.

*Simpkins* at ¶ 40-41.

{¶ 44} Nevertheless, Brandt contends that the severity of her emotional injuries and the resulting impact on her life rises to the level of the physical injuries excepted from the damage caps by R.C. 2315.18 such that applying the damage caps to her violates due process.

{¶ 45} In *Simpkins*, the court noted that R.C. 2315.18(B)(3) excludes from the damage caps in R.C. 2315.18(B)(2) noneconomic damages for "[p]ermanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system," or for "[p]ermanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining injuries." Thus, it concluded that the exceptions to the damage caps in R.C. 2315.18(B)(3) require "extreme qualifications." *Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, at ¶ 43, citing *Weldon v. Presley*, N.D.Ohio No. 1:10 CV 1077, 2011 U.S. Dist. LEXIS 95248 (Aug. 9, 2011).

{¶ 46} In considering whether Simpkins's emotional injuries met these "extreme qualifications," the court noted there was evidence that she suffers from PTSD and low-grade depression as a result of the perpetrator's sexual assault. *Simpkins* at ¶ 44. There was also evidence that she is afraid of the dark, suffers from anxiety, and has trust issues with men. *Id.* There was other evidence, however, that she played basketball in college, received good grades in college, was currently employed full-time, and had not been in counseling for some time and had no current plans to seek further counseling. *Id.* In light of that evidence, the court concluded she was "able to independently care for herself and perform life-sustaining activities." *Id.* Accordingly, the court found that although Simpkins had undoubtedly suffered serious emotional and psychological injuries as a result of the sexual abuse, her noneconomic injuries did not meet the "extreme qualifications"

required by the law in order to avoid the operation of the damage caps of R.C. 2315.18. *Id.*

{¶ 47} We reach the same conclusion here. The evidence indicates that Brandt suffers from PTSD, depression, anxiety, and recurrent nightmares. The evidence also indicates that some years after the abuse, she became a heroin addict and tried to commit suicide. She also was homeless for a year. She has been in counseling many times during the years after the abuse and assumes she will need counseling for the foreseeable future, an assumption corroborated by Dr. Yingling.

{¶ 48} But the evidence also indicates that Brandt is married and has two young children. She works part-time as a waitress, and has completed the necessary classes to obtain her real estate license and hopes to establish a career selling real estate. Thus, it appears that she is able to independently care for herself and perform life-sustaining activities, even though her participation in some activities, such as those involving crowds, is admittedly very limited.

{¶ 49} Moreover, the evidence is not clear that all of Brandt's mental health issues and the negative events that occurred in her life after the abuse are attributable to the sexual abuse. Brandt's testimony seems to indicates that she chose to be homeless in order to be with her boyfriend, who did not have housing. And although Dr. Yingling attributed Brandt's PTSD to the sexual abuse, he conceded that an abusive relationship, such as Brandt's abusive boyfriend, can lead to PTSD. Likewise, he conceded that homelessness and a heroin overdose can lead to PTSD. He admitted that an individual's relationship with their parents, siblings,

and extended family can be important to a diagnosis of PTSD, but conceded that he had not asked Brandt about those relationships with any level of detail. He further admitted that there is a family history of substance abuse issues in Brandt's family, and that one of her relatives had attempted suicide. He also admitted that it is impossible to know when Brandt "officially had PTSD" or how long her symptoms will continue.

{¶ 50} We recognize that Brandt suffered real and debilitating mental health issues immediately after she and her family learned of the abuse and in the years following the abuse. We also recognize that she currently suffers mental health issues with accompanying symptoms. Nevertheless, it is not clear that all of her mental health issues and symptoms can be attributed to the sexual abuse. Because the evidence is equivocal, we cannot find that Brandt's injuries meet the "extreme qualifications" the law requires in order to avoid the operation of the damage caps in R.C. 2315.18(B)(2).

{¶ 51} Accordingly, we conclude that Brandt failed to demonstrate by clear and convincing evidence that the trial court's application of the R.C. 2315.18(B)(2) damage caps to the jury's damages award amounted to a violation of due process.

### D. Equal Protection

{¶ 52} Brandt's final constitutional challenge asserts that as applied here, R.C. 2315.18 violates the right to equal protection guaranteed by Article I, Section 2 of the Ohio Constitution. The Ohio Supreme Court has interpreted Article I, Section 2 of the Ohio Constitution to be the equivalent of the Equal Protection Clause of the

United States Constitution. *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 63, citing *McCrone v. Bank One Corp.*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, ¶ 7.

{¶ 53} Because R.C. 2315.18 does not involve a fundamental right nor a suspect class, we review the statute under the rational-basis test, which requires us to uphold it if it is rationally related to a legitimate governmental purpose. *Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, at ¶ 47, citing *Arbino* at ¶ 66, citing *State v. Williams*, 88 Ohio St.3d 513, 530, 728 N.E.2d 342 (2000).

{¶ 54} Brandt contends that we should apply a strict scrutiny analysis because R.C. 2315.18 impinges upon the fundamental right to trial by jury,[2] but argues that even under the rational-basis test, the statute violates her equal protection rights. She asserts that when applied to minors who are victims of sexual assault, like herself, R.C. 2315.18 creates an irrational distinction between those with the serious physical injuries designated in R.C. 2315.18(B)(3), whose noneconomic damages are not capped, and "those who, by the nature of the tort and the age of the victim, will rarely, if ever, suffer permanent physical injury but have and will continue to suffer permanent catastrophic nonphysical injuries." (Appellant's Brief, p. 20).

{¶ 55} This argument was considered and rejected in *Simpkins*. The court stated:

---

[2] As discussed above, consistent with *Simpkins* and *Arbino*, we reject Brandt's assertion that R.C. 2315.18 violates the fundamental right to trial by jury.

But the statutory classification remains the same regardless of the age of the victim or the nature of the tort. And the legislative classification applies the same to all persons; absent the physical injuries designated in R.C. 2315.18(B)(3), the statutory damage caps on noneconomic loss apply. Even if we accept appellants' characterization of Simpkins's injuries as catastrophic, the General Assembly's determination that the types of physical injuries listed in R.C. 2315.18(B)(3) offer more concrete evidence of noneconomic damages provides a rational basis for limiting noneconomic damages that are not accompanied by those types of serious physical injuries.

*Simpkins* at ¶ 50.

{¶ 56} Accordingly, consistent with *Simpkins*, we find that Brandt has not demonstrated by clear and convincing evidence that R.C. 2315.18 violates her right to equal protection under Article I, Section 2 of the Ohio Constitution.

{¶ 57} The first assignment of error is therefore overruled.

## IV. The Continuing Validity of the Ohio Supreme Court's Decision in *Arbino*

{¶ 58} In her second assignment of error, Brandt contends that *Arbino* should be overruled because it was wrongly decided. She asserts that we should not recognize and follow *Arbino* because circumstances have changed since it was decided, the decision "defies practical workability," and abandoning the decision would not create an undue hardship for those who have relied on it.

{¶ 59} As discussed above, this court, as an intermediate court, is required to follow and apply Ohio Supreme Court decisions, even if the appellate judges disagree with the Ohio Supreme Court's determination. *Gehad*, 10th Dist. Franklin No. 05AP-1181, 2006-Ohio-3081, at ¶ 7. We have no authority to modify, much less overrule, any decision of the Ohio Supreme Court. Nevertheless, we recognize that

to preserve an issue for review by the Ohio Supreme Court, a litigant must first present the issue to this court.

**{¶ 60}** Because we have no authority to overrule *Arbino*, the second assignment of error is overruled.

**{¶ 61}** Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_Kathleen Ann Keough_

KATHLEEN ANN KEOUGH, JUDGE

ANITA LASTER MAYS, P.J., and
MARY EILEEN KILBANE, J., CONCUR