[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Brandt v. Pompa*, Slip Opinion No. 2022-Ohio-4525.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4525

BRANDT, APPELLANT, *v*. POMPA, APPELLEE, ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Brandt v. Pompa*, Slip Opinion No. 2022-Ohio-4525.]**

*Civil law—Damages—R.C. 2315.18—As-applied constitutional challenge—Due process of law—Article I, Section 16, Ohio Constitution—Statutory cap on awards of compensatory damages for noneconomic losses set forth in R.C. 2315.18 is arbitrary and unreasonable and therefore unconstitutional as applied to plaintiff and similarly situated plaintiffs who were child victims of intentional criminal conduct, such as sexual abuse, and who bring civil actions to recover damages from the persons who have been found guilty of those intentional criminal acts to the extent that it fails to include an exception for plaintiffs who have suffered permanent and severe psychological injuries—Judgment reversed—Jury verdict on damages reinstated.*

(No. 2021-0497—Submitted March 30, 2022—Decided December 16, 2022.)

APPEAL from the Court of Appeals for Cuyahoga County,

No. 109517, 2021-Ohio-845.

———————————

**O'CONNOR, C.J.**

{¶ 1} In this appeal, we determine whether the compensatory-damages caps for noneconomic loss in R.C. 2315.18 are unconstitutional as applied to appellant, Amanda Brandt. A jury found that Brandt was entitled to a total-damages award that included $20 million in compensatory damages for noneconomic loss against appellee, Roy Pompa, who sexually abused Brandt when she was a child. The trial court applied the statutory damages cap in R.C. 2315.18 and limited the award for noneconomic loss to $250,000. We find the statutory cap as applied to this portion of Brandt's award to be arbitrary and unreasonable and thus in violation of the due-course-of-law guarantee of the Ohio Constitution. *See* Article I, Section 16, Ohio Constitution. We therefore hold that R.C. 2315.18 is unconstitutional as applied to Brandt.

## I. RELEVANT BACKGROUND

{¶ 2} In 2006, Pompa was arrested and charged with, among other things, 17 counts of rape, 5 counts of kidnapping, 55 counts of pandering sexually oriented matter involving a minor, and 21 counts of gross sexual imposition. Pompa was accused of committing these acts against Brandt and other victims. Brandt was 11 and 12 years old when the incidents occurred.

{¶ 3} A jury found Pompa guilty of over 90 counts, 34 of which involved acts against Brandt.[1] The court sentenced Pompa to life in prison.

---

1. The offenses committed against Brandt for which Pompa was found guilty occurred on seven different occasions in 2004 and 2005 and included 18 counts of gross sexual imposition, 8 counts of rape, 3 counts of kidnapping, 4 counts of pandering sexually oriented matter involving a minor under 13 years of age, and 1 count of illegal use of a minor in nudity-oriented material.

{¶ 4} In 2018, Brandt filed a civil complaint against Pompa[2] in the Cuyahoga County Court of Common Pleas for intentional criminal wrongdoing, knowing dissemination of child pornography, and intentional infliction of emotional distress. She also asked the trial court for a declaratory judgment holding R.C. 2315.18 unconstitutional as applied to her case. The trial court held that based on the verdicts in the criminal case and Pompa's admissions, there was no genuine issue of material fact as to Pompa's liability in the tort action. A jury trial was commenced solely to determine the type and amount of Brandt's damages.

{¶ 5} At the damages trial, the jury learned of the 34 criminal offenses committed against Brandt for which Pompa was convicted, and the jury viewed Pompa's testimony from a videotaped deposition. The jury also heard testimony from Brandt and Brandt's mother, as well as expert testimony from a clinical psychologist.

{¶ 6} Brandt testified that Pompa was a friend of the Brandt family and that one of Pompa's daughters was her childhood best friend. Brandt frequently attended sleepovers at Pompa's residence, just a mile away from her home. Brandt recalled that before going to bed at the sleepovers, Pompa would offer her a juice box, iced tea, or water. She said that although it did not strike her at the time, "there was not a morning [after a sleepover] that [she] didn't wake up a little blurry, fuzzy feeling, * * * groggy." The Eighth District Court of Appeals found that "[o]n many occasions, Pompa put illicit substances in Brandt's drinks before she went to sleep in order to commit sexual acts against her without her knowing or being fully aware." 2021-Ohio-845, 169 N.E.3d 285, ¶ 2. But Brandt was aware. Brandt testified that she recalled occasions of abuse at the Pompa residence, particularly, being woken up at night at the feeling of being touched and realizing it was someone touching her all over and under her underwear. Eventually, Brandt no

---

2. Brandt also filed her complaint against Pompa's ex-wife, but those claims were settled before trial.

longer wanted to go to the Pompa residence. She realized that "something was not right" there, and she felt "very panicked at the idea of going over" there. She said, "I tried very hard to not get put back into that home."

{¶ 7} Pompa admitted the sexual abuse involved him masturbating on Brandt, ejaculating on her, including on her face, and abusing her with a dildo or vibrator. The Eighth District found that Pompa recorded his sexual abuse of Brandt on at least eight occasions. *Id.* at ¶ 6. Pompa also admitted using a "spy cam" to view his daughter's friends when they visited the house.

{¶ 8} Brandt told the jury she "was a pretty normal kid" until the abuse. Her mother described Brandt prior to the abuse as follows:

> She was a beautiful, happy-go-lucky friend to everyone. She wanted to conquer the world, loved to travel, loved to go places, had big dreams, was involved in a lot of school activities. You know, she was friends with sports people. She was friends with drama people. She was friends with * * * honor students * * *. She was, like, a friend to everyone. She was involved in church. She went [on] all kinds of mission trips. She just had a big heart and was very outgoing.

{¶ 9} Brandt's mother testified that her daughter became a recluse after the abuse: "Her anxiety level was huge. She never wanted to go anywhere. We saw this beautiful, outgoing child turn into someone that didn't want to leave. She just wanted to be alone." Brandt's mother said that her daughter became angry and had sleeping problems. These issues prompted Brandt's mother to take Brandt to see a therapist twice a week, even though the therapist was not close to their home. Brandt's mother testified that the abuse had "totally changed" her daughter. She explained, "I do not have the same daughter anymore. She has a lot of anger, has

a lot of anxiety issues. She can't handle being at a lot of family functions. She has to go to another room when everyone is there. She just is not the same kid that we knew growing up and even now in her adulthood."

{¶ 10} Brandt also testified to the changes she experienced as a result of the abuse. She started having nightmares after the first time Pompa sexually abused her, and she continues to have nightmares, including ones in which Pompa appears. Brandt told the jury that she became a "very angry kid" after the abuse started. She read for the jury a statement she had prepared for Pompa's sentencing in the criminal case. In that statement, she described having been involved in clubs, community service, and social activities before the abuse. She wrote about losing her relationship with her best friend, Pompa's daughter. She described having difficulty sleeping and having serious emotional problems. "Most of the time I don't know what to feel," she wrote. "When I do, it's always anger." She also wrote about not being able to remember anything at school, which caused her grades to suffer and affected which classes she was able to take in high school.

{¶ 11} Brandt testified that after the abuse stopped, she graduated from high school and moved out of her parents' home into an apartment, but she had trouble keeping a job. About her first full-time job, she explained, "[M]y anxiety had been getting worse at that point and after a couple of years there, I was no longer able to meet my requirements and I ended up getting terminated from that job because I could no longer do the things required." She eventually found a door-to-door-sales job, which was worked in pairs. Her coworker offered her heroin, assuring Brandt that she "would feel better" if she tried it. Brandt did try it and became addicted. She told the jury that at that time, she was "desperate for anything that would make [her] feel okay."

{¶ 12} At the beginning of her drug addiction, Brandt lost her apartment and became homeless for approximately a year. Brandt testified about continuing to have panic attacks and not being able to sleep during that time. She said she

"was at a really low point in [her] mental health and there was no break." She eventually sought help and returned to her parents' home.

{¶ 13} Brandt testified that while living with her parents and trying to get sober, her "mental health continued to get worse." She testified about attempting suicide and spending time in the hospital after an intentional heroin overdose. After her time in the hospital, she moved in with her parents and was able to stop using heroin. She told the jury that she had been sober for more than six years as of the time of the trial.

{¶ 14} At the time of the trial, Brandt was married and had two young children. She explained that she was still having nightmares about Pompa, which affected her sleep and her ability to function the next day despite her taking prescription medication to try to control them. She worked part-time as a server in the food industry, working Mondays and Tuesdays to avoid the busier shifts and crowds, and was trying to get her real-estate license.

{¶ 15} Brandt began attending counseling immediately after her parents learned of the abuse. As of the date of the hearing on damages, she had been in counseling 14 years, and she testified that she could not foresee a time when she would not need counseling. She explained, "I've seen multiple different counselors in multiple different areas and gone through multiple different treatment plans. Every counselor I've seen has agreed on the diagnosis of [posttraumatic stress disorder ("PTSD")] and anxiety disorder." Brandt also described her use of medication not only to prevent nightmares but also to treat depression and PTSD. She testified that one of the prescribed medications had improved her ability to sleep uninterrupted, but it was unsuccessful at stopping all the nightmares. She testified that her anxiety, including difficulty being in crowds and not liking to be touched, still prevents her from enjoying social activities and taking part in community service and that it affects her ability to perform daily activities like grocery shopping.

6

{¶ 16} Dr. Patrick Yingling, a psychological expert, testified in a video deposition about his evaluation of Brandt. Dr. Yingling testified that Brandt described for him her experiences with the abuse and with her mental health following the abuse. He noted that Brandt described "her experience of developing panic attacks and agoraphobia in 2014." He said she recalled staying locked in a bedroom for a "large chunk of months." Dr. Yingling testified that Brandt described continuing to experience nightmares, thoughts about her own death, and anxiety leading to "meltdowns." He also testified that Brandt described her panic attacks as "weirdly physical," including uncontrollable crying, blurry vision, and ringing in her ears, and "[f]eeling like [she had] barbed wire around [her] chest." He said Brandt noted that she had tried to fix the meltdowns but that she was still experiencing them. Brandt provided Dr. Yingling with specific instances of anxiety attacks, for example, when not being allowed to be with her daughter at her ballet class, when considering having to go back to work, and on some occasions, when her husband reached out to touch her.

{¶ 17} Based on his evaluation of Brandt, including the tests administered and the records reviewed, Dr. Yingling opined that Brandt suffered from PTSD as a result of being sexually assaulted by Pompa and that her symptoms would persist to some degree over a significant period of time. He opined that Brandt would benefit from ongoing psychotherapy as well as psychiatric medication.

{¶ 18} On cross-examination, Pompa's counsel questioned Dr. Yingling about whether Brandt's symptoms were conclusively causally linked to the sexual abuse or whether they were, instead, brought on or exacerbated by other factors, like Brandt's addiction or homelessness. Dr. Yingling explained that the criteria for a PTSD diagnosis requires exposure to actual or threatened death, serious injury, or sexual violence, and he acknowledged that an overdose or a suicide attempt could cause or contribute to a diagnosis of PTSD.

{¶ 19} At the close of the evidence, the trial-court judge instructed the jury on its duty to determine what damages, if any, Brandt was entitled to. The trial court included the following specific instructions on awarding compensatory damages:

You will decide by the greater weight of the evidence an amount of money that will reasonably compensate the Plaintiff for the actual injury directly caused by the conduct of the Defendant, Roy Pompa.

In deciding this amount, you will consider the Plaintiff's loss directly caused by the Plaintiff's actual injury.

The Plaintiff seeks compensation for non-economic loss only. She does not seek compensation for economic loss such as medical bills and so forth.

"Noneconomic loss" means harm other than economic loss that results from the Plaintiff's injury, including, but not limited to, pain and suffering; disfigurement; mental anguish; and any other intangible loss. "Intangible loss" refers to loss that does not have a physical presence.

The Plaintiff also claims that the injury or loss is permanent. As to such claims, no compensation or damages may be found except that which is reasonably certain to exist as a direct cause of the Defendant's conduct. "Reasonably certain" means probably, that is, more likely to occur than not.

If you find that Plaintiff failed to prove by the greater weight of the evidence any amount of damages, you may award Plaintiff nominal damages. "Nominal" means trifling or small.

> MATHEMATICAL FORMULA. Any suggestion of counsel in argument that you use a mathematical formula to compensate for pain and suffering and disability cannot be considered as evidence. There is no recognized mathematical formula for pain and suffering. Compensation for pain and suffering and disability is solely within your province to decide.

{¶ 20} The jury awarded Brandt (1) $14 million in compensatory damages for the abuse she suffered before April 6, 2005, when the damages caps in R.C. 2315.18 went into effect, (2) $20 million in compensatory damages for the abuse she suffered after R.C. 2315.18 went into effect, and (3) $100 million in punitive damages.

{¶ 21} In a posttrial brief, Pompa requested that the court limit the noneconomic damages that were awarded for the period after the effective date of R.C. 2315.18. His sole assertion was that the reduction in damages was required under R.C. 2315.18. Brandt opposed the request and again asked the trial court to find that R.C. 2315.18 was unconstitutional as applied to her. The trial court granted Pompa's request, denied Brandt's request for declaratory relief, and reduced Brandt's $20 million noneconomic-damages award to $250,000.

{¶ 22} Brandt appealed. The Eighth District applied the reasoning and rationale set forth in *Simpkins v. Grace Brethren Church of Delaware, Ohio*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122 (lead opinion), and finding no meaningful difference between *Simpkins* and Brandt's case, affirmed the trial court's judgment.

{¶ 23} We accepted discretionary review of Brandt's appeal. 163 Ohio St.3d 1501, 2021-Ohio-2307, 170 N.E.3d 891.

## II. ANALYSIS

### A. *R.C. 2315.18's cap on noneconomic damages*

{¶ 24} R.C. 2315.18 describes how compensatory damages may be awarded in tort claims for economic loss and noneconomic loss. Relevant here is noneconomic loss, which includes "pain and suffering, loss of society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, or education, disfigurement, mental anguish, and any other intangible loss." R.C. 2315.18(A)(4).[3] R.C. 2315.18(B)(2) provides that the amount of compensatory damages for noneconomic loss is capped and "shall not exceed the greater of [$250,000] or an amount that is equal to three times the economic loss, as determined by the trier of fact, of the plaintiff in that tort action to a maximum of [$350,000] for each plaintiff in that tort action or a maximum of [$500,000] for each occurrence that is the basis of that tort action." R.C. 2315.18(B)(3)(a) and (b) explain that there is no limit on damages for noneconomic loss, however, if the loss is for "[p]ermanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system" or "[p]ermanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities."

---

3. By contrast, R.C. 2315.18 (A)(2) defines "economic loss" as

> any of the following types of pecuniary harm:
> (a) All wages, salaries, or other compensation lost as a result of an injury or loss to person or property that is a subject of a tort action;
> (b) All expenditures for medical care or treatment, rehabilitation services, or other care, treatment, services, products, or accommodations as a result of an injury or loss to person or property that is a subject of a tort action;
> (c) Any other expenditures incurred as a result of an injury or loss to person or property that is a subject of a tort action, other than attorney's fees incurred in connection with that action.

{¶ 25} These caps on damages for noneconomic loss became effective April 7, 2005.[4] *See* Am.Sub.S.B. No. 80, Section 3, 150 Ohio Laws, Part V, 7915, 8024-8031 ("S.B. 80"). S.B. 80 was not the General Assembly's first effort to enact tort reform, but previously enacted tort-reform statutes had been successfully challenged in courts as being unconstitutional. *See Morris v. Savoy*, 61 Ohio St.3d 684, 686, 690-691, 576 N.E.2d 765 (1991) (Ohio Medical Malpractice Act of 1975, enacted by Am.Sub.H.B. No. 682, 136 Ohio Laws, Part II, 280, 2813, violated the right to due process); *Sorrell v. Thevenir*, 69 Ohio St.3d 415, 418-420, 633 N.E.2d 504 (1994) (former R.C. 2317.45, enacted by Am.Sub.H.B. No. 1, 142 Ohio Laws, Part 1, 1661, 1694, as part of the Tort Reform Act of 1987, violated the rights to a jury trial, due process, and equal protection and the right to a remedy); *Galayda v. Lake Hosp. Sys., Inc.*, 71 Ohio St.3d 421, 644 N.E.2d 298 (1994), paragraph one of the syllabus (former R.C. 2323.57 violated the rights to a jury trial and due process); *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397 (1994), paragraph two of the syllabus (former R.C. 2315.21(C)(2) violated the right to a jury trial); *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451, 715 N.E.2d 1062 (1999), paragraphs two and three of the syllabus (Am.Sub.H.B. No. 350, 146 Ohio Laws, Part II, 3867, violated the separation-of-powers doctrine and the one-subject rule).

{¶ 26} But in *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, this court concluded that R.C. 2315.18 was constitutional on its face.

---

4. This section of the Revised Code became effective April 7, 2005. It was amended by the General Assembly, effective April 15, 2021, by 2020 Sub.H.B. No. 352, but the amendments do not affect Brandt or the question of her entitlement to the amount of noneconomic damages awarded to her by the jury.

### B. Standard of review

{¶ 27} Unlike the challenge to R.C. 2315.18 in *Arbino*, Brandt has presented a claim that the statute is unconstitutional as applied to the facts of her case. In an as-applied constitutional challenge, "the party making the challenge bears the burden of presenting clear and convincing evidence of a presently existing set of facts that [makes the statute] unconstitutional and void when applied to those facts." *Groch v. Gen. Motors Corp.*, 117 Ohio St.3d 192, 2008-Ohio-546, 883 N.E.2d 377, ¶ 181, quoting *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 38. Thus, the constitutional claim that this court addressed in *Arbino* differs from Brandt's constitutional claim here. To establish a constitutional violation through a facial challenge, Arbino was required to demonstrate "that there [was] no set of circumstances in which [R.C. 2315.18] would be valid." *Arbino* at ¶ 26, citing *Harrold* at ¶ 37, citing *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). To establish a constitutional violation through a facial challenge, it is not enough " 'that a statute might operate unconstitutionally under some plausible set of circumstances.' " *Id.*, quoting *Harrold* at ¶ 37.

### C. Due-course-of-law challenge

{¶ 28} Article I, Section 16 of the Ohio Constitution guarantees every person the right to a "remedy by due course of law" "for an injury done him in his land, goods, person, or reputation." In *Arbino*, one asserted basis of the facial constitutional challenge to R.C. 2315.18 was that the damages caps in that statute violated the "due course of law" provision of the Ohio Constitution. *Arbino* at ¶ 7, 48. In addressing that question, this court applied the rational-basis test under which a statute is deemed valid " ' "[1] if it bears a real and substantial relation to the public health, safety, morals or general welfare of the public and [2] if it is not unreasonable or arbitrary." ' " (Brackets added in *Mominee*.) *Id.* at ¶ 49, quoting *Mominee v. Scherbarth*, 28 Ohio St.3d 270, 274, 503 N.E.2d 717 (1986), quoting *Benjamin v. Columbus*, 167 Ohio St. 103, 146 N.E.2d 854 (1957), paragraph five

12

of the syllabus. Considering the second prong of that test, this court noted its concern that in previous efforts to cap tort damages, the General Assembly had "imposed the cost of the intended benefit to the public solely upon those most severely injured." *Id.* at ¶ 59, citing *Savoy*, 61 Ohio St.3d at 690-691, 576 N.E.2d 765, and *Sheward*, 86 Ohio St.3d at 490, 715 N.E.2d 1062. But we noted that "R.C. 2315.18 alleviates this concern by allowing for limitless economic damages for those suffering catastrophic injuries." *Arbino* at ¶ 60, citing R.C. 2315.18(B)(3)(a) and (b). We also noted that the General Assembly had "found that the benefits of noneconomic-damages limits could be obtained without limiting the recovery of individuals whose pain and suffering is traumatic, extensive, and chronic, and by setting the limits for those not as severely injured at either $250,000 or $350,000." *Id.* at ¶ 61. We concluded that the legislature's policy decision was "tailored to maximize benefits to the public while limiting damages to litigants," and that such "logic [was] neither unreasonable nor arbitrary." *Id.*

{¶ 29} This court also rejected Arbino's equal-protection challenge with similar reasoning, employing the rational-basis test and concluding as follows:

> The distinctions the legislature drew in refusing to limit certain
> injuries were rational and based on the conclusion that catastrophic
> injuries offer more concrete evidence of noneconomic damages and
> thus calculation of those damages poses a lesser risk of being tainted
> by improper external considerations.

*Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 72.

{¶ 30} A significant distinction stands out between the facts presented in *Arbino* and the facts of this case. Psychological injuries are not included in the permanent-injury exception to the compensatory-damages caps for noneconomic loss provided in R.C. 2315.18(B)(3)(a) and (b). Those statutory provisions except

"[p]ermanent and substantial *physical* deformity, loss of use of a limb, or loss of a bodily organ system" or "[p]ermanent *physical* functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities." (Emphasis added.) *Id.* *Arbino* originated in federal court as a product-liability action against the companies that had created a hormonal-birth-control medication that allegedly caused the plaintiff's blood clots and other serious medical side effects. *Id.* at ¶ 1. We were not presented with facts of psychological injuries in that case, nor were we asked to opine on the reason for their exclusion from the statute.

{¶ 31} But here, in light of the unavailability of the exception to the compensatory-damages caps for the most severely and permanently *psychologically* injured, we cannot say, as we did in *Arbino*, that R.C. 2315.18 allows "for limitless noneconomic damages for those suffering catastrophic injuries," *Arbino* at ¶ 60, because those suffering catastrophic *psychological* injury are excluded from that class of injured plaintiffs. Thus, the rational basis of the statute found by this court in *Arbino* is eliminated as applied to Brandt and similarly situated plaintiffs. For this limited class of litigants—people like Brandt who were victimized at a very young age and who bring civil actions to recover damages from the persons who have been found guilty of those intentional criminal acts—the constitutional guarantee of due course of law is unjustly withheld.

{¶ 32} Other legislative justifications cited by this court in *Arbino* also fail when considered in light of R.C. 2315.18's application, without exception, to catastrophic psychological injuries as a result of victimization as a child. For example, in *Arbino*, we acknowledged the General Assembly's concern that "noneconomic damages are inherently subjective and thus easily tainted by irrelevant considerations." *Id.*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 55. But other statutory safeguards exist to address that concern. For example, R.C. 2315.18(C) expressly prohibits the trier of fact (i.e., the jury in a jury

trial) from considering (1) a defendant's wrongdoing, misconduct, or guilt, (2) a defendant's wealth or financial resources, or (3) evidence offered for the purpose of punishing the defendant, when determining the amount of compensatory damages to award for noneconomic loss. And if a defendant challenges an award of compensatory damages for noneconomic loss as excessive, R.C. 2315.19 instructs the trial court to consider, among other things, whether the evidence "inflamed the passion or prejudice of the trier of fact." Given the adequate safeguards in place to ensure that an award in a specific case is not "tainted by irrelevant considerations," see *Arbino* at ¶ 55, coupled with the trial court's authority to review an allegedly excessive award on a case-by-case basis, the General Assembly's caps on damages as applied to a plaintiff such as Brandt seem arbitrary. It is unclear how application of the caps on damages in R.C. 2315.18 to a plaintiff like Brandt who is not entitled to an exception to the caps for severe psychological injury serves, in any manner other than an arbitrary one, to address the General Assembly's concerns that noneconomic damages are inherently subjective and easily tainted by irrelevant considerations.

{¶ 33} In *Arbino*, we also noted that the General Assembly's stated justification for enacting tort reform through R.C. 2315.18 was its " 'interest in making certain that Ohio has a fair, predictable system of civil justice that preserves the rights of those who have been harmed by negligent behavior, while curbing the number of frivolous lawsuits, which increases the cost of doing business, threatens Ohio jobs, drives up costs to consumers, and may stifle innovation.' " *Arbino* at ¶ 68, quoting S.B. 80, Section 3(A)(3), 150 Ohio Laws, Part V, at 8024. But Brandt was harmed by *intentional*, not negligent, behavior. And it cannot be said that Brandt's lawsuit against Pompa is frivolous, given that his criminal liability for abusing Brandt has already been determined.

{¶ 34} The General Assembly's concern about the "cost of doing business," S.B. 80, Section 3(A)(3), 150 Ohio Laws, Part V, at 8024, as it relates to the cost

of general-liability-insurance policies that businesses purchase is unrealistic because coverage for the types of injuries that Brandt sustained in this case is extremely uncommon and, even if a business's liability-insurance policy were in play, most policies now contain exclusions for intentional conduct committed by the insured and, specifically, for abuse or molestation. *See, e.g., World Harvest Church v. Grange Mut. Cas. Co.*, 148 Ohio St.3d 11, 2016-Ohio-2913, 68 N.E.3d 738. Thus, the only beneficiary of the General Assembly's damages cap in this case is Brandt's abuser, not the public and not the insurance industry.

{¶ 35} This court noted in *Arbino* that the General Assembly's policy decision "to achieve a public good" was based on a finding that "the benefits of noneconomic-damages limits could be obtained *without limiting* the recovery of individuals whose pain and suffering is *traumatic, extensive, and chronic*." (Emphasis added.) *Id.*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 61. We concluded that this policy decision was "tailored to maximize benefits to the public while limiting damages to litigants" and was based on logic that was "neither unreasonable nor arbitrary." *Id.* What we now know, given Brandt's case, is that some who fit within this category—those "whose pain and suffering is traumatic, extensive, and chronic," *id.*—are subject to limited recovery simply because their injuries are psychological, as opposed to physical, in nature. Thus, in concluding in *Arbino* that the General Assembly's decision to enact compensatory-damages caps for noneconomic loss was not arbitrary on its face, we overlooked a small class of plaintiffs who *are* arbitrarily excluded from recovering the full amount of compensatory damages for noneconomic loss that was awarded by the jury. While policy decisions are the purview of the legislature, it is the judiciary's purview to determine whether those policy decisions violate the constitutional protections guaranteed to all Ohioans. *See* Article IV, Section 2(B)(2)(ii), Ohio Constitution.

**{¶ 36}** When viewing the damages caps set forth in R.C. 2315.18 in light of the facts of this case, the words of one of the dissenting justices in *Arbino* are persuasive:

> There is no rational reason to "improve" the tort system in Ohio at the sole expense of a small group of people who are able to prove that they suffered damage significant enough to exceed the damages caps imposed by the General Assembly. Whatever improvement the tort system in Ohio needs, the Ohio Constitution should remain inviolate, unless properly amended.

*Arbino* at ¶ 185 (Pfeifer, J., dissenting). Brandt represents an even smaller group of people than that contemplated by the dissenting justice quoted above—namely, those child victims who suffer traumatic, extensive, and chronic psychological injury as a result of intentional criminal acts and who sue their abusers for civil damages. Subjecting this group to the compensatory-damages caps for noneconomic loss has little to no connection to improving the tort system in Ohio.[5] This group comprises victims who are entitled to the full range of constitutional remedies, regardless of whether their severe injuries are physical or psychological.

**{¶ 37}** These concerns leave sufficient doubt that *Arbino* correctly determines the constitutionality of R.C. 2315.18 as applied to Brandt and similarly

---

5. The General Assembly's justification for enacting tort-reform legislation, including R.C. 2315.18, was to balance the rights of victims of *negligent behavior* against the problems caused by an allegedly unpredictable civil-justice system. *See* S.B. 80, Section 3(A)(3), 150 Ohio Laws, Part V, at 8024. The General Assembly's policy choice appears to presume that some level of harm caused by negligent acts (e.g., automobile accidents, defective consumer products, imperfect medicine, human error) is tolerable in society on balance for institutions and businesses that need predictability for liability for this kind of conduct. But the sexual abuse of children is *never* tolerated. Accordingly, it makes no sense to credit the General Assembly with a policy decision to protect an abuser from being subject to a damages award that is meant to compensate a victim of childhood sexual abuse.

situated plaintiffs. In fact, because the rationale supporting *Arbino* falls away when applied to the facts of this case, and given the facts below, we conclude that Brandt has shown by clear and convincing evidence that R.C. 2315.18 is unconstitutional as applied to her under the due-course-of-law provision in Article I, Section 16 of the Ohio Constitution.

**{¶ 38}** The Eighth District relied largely on *Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, in rejecting Brandt's as-applied challenge. But *Simpkins* was a plurality opinion, and the reasoning from *Simpkins* that the court of appeals relied on when reviewing this case was the viewpoint of only two justices. Thus, the *Simpkins* analysis is not controlling here.

**{¶ 39}** Turning to the facts of this case, there is no question that Brandt has suffered severely as a victim of Pompa's intentional criminal acts. There is no dispute that the jury found that Brandt should be awarded compensatory damages for noneconomic loss in the amount of $20 million for the abuse that she suffered after R.C. 2315.18 became effective. The trial court's instructions to the jury explained that Brandt sought compensation only for noneconomic loss, and the instructions defined "noneconomic loss" and "intangible loss." The instructions also explained that Brandt claimed that the injury or loss she suffered was permanent. The instructions provided: "There is no recognized mathematical formula for pain and suffering. Compensation for pain and suffering and disability is solely within your province to decide."[6] The record also shows that the jurors submitted questions to the trial court during Brandt's testimony, inquiring about other possible causes of Brandt's injuries. Charged with the trial court's instructions and with answers to their questions, the jurors unanimously awarded

---

6. R.C. 2315.18(F)(2) states: "If the trier of fact is a jury, the court shall not instruct the jury with respect to the limit on compensatory damages for noneconomic loss described in division (B)(2) of this section, and neither counsel for any party nor a witness shall inform the jury or potential jurors of that limit."

Brandt $20 million in compensatory damages for permanent noneconomic loss for the period in question.

{¶ 40} Pompa's sole argument to the trial court in his posttrial brief on damages was that the court should calculate the amount of damages pursuant to the damages caps in R.C. 2315.18. He did not challenge the evidence by arguing, for example, that the award was excessive, that the evidence had inflamed the passion or prejudice of the jury, that the jury improperly considered his misconduct, or that the award was in excess of verdicts awarded to similarly situated plaintiffs. *See* R.C. 2315.19(A)(1) and (2).

{¶ 41} The Eighth District characterized the evidence regarding whether "all of [Brandt's] mental health issues and symptoms can be attributed to the sexual abuse" as "equivocal." 2021-Ohio-845, 169 N.E.3d 285, at ¶ 50. But the jury here (i.e., the trier of fact) did not. Indeed, the jury instructions were clear regarding the jury's ability to award Brandt damages based on her claims that the injury or loss that she suffered was permanent: "[N]o compensation or damages may be found except that which is reasonably certain to exist as a direct cause of the Defendant's conduct." And the jury was instructed that it could award nominal damages if it found that Brandt had failed to prove any amount of damages by the greater weight of the evidence. Nonetheless, the jury found a significant monetary award to be appropriate. Notwithstanding the application of the compensatory-damages caps, the fact-finding function of the jury to determine the amount of damages to be awarded is not to be intruded upon or ignored or replaced by another body's findings. *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 37. Trial courts are authorized to review an award that "the defendant has challenged as excessive," R.C. 2315.19(A), and appellate courts may conduct a de novo review of such an award on appeal, R.C. 2315.19(C), but it is the duty of the trier of fact to ascertain the amount of the plaintiff's loss, *see* R.C. 2315.18(B)(2) and (C). Here, the jury was in the best position to weigh the credibility of Brandt's testimony

and that of the other witnesses. In doing so, the jury determined that Brandt suffered permanent noneconomic loss severe enough to warrant a $20 million award for the abuse that she suffered after R.C. 2315.18 went into effect. Thus, the court of appeals' equivocation regarding the evidence is unpersuasive because it appears that the court was substituting its own view of the evidence for the jury's findings.

{¶ 42} Because R.C. 2315.18(B)(3) does not include an exception for severe and permanent psychological injuries in its caps on damages for noneconomic loss and because the trial court applied R.C. 2315.18 to reduce Brandt's $20 million award to $250,000, we hold that Brandt has established, by clear and convincing evidence, a set of facts that make the statute unconstitutional as applied to her case.

### D. Recoverability is irrelevant

{¶ 43} Pompa argues that because Brandt received a judgment "exceeding $114 million, [she] cannot credibly be heard to argue that she has been prevented or foreclosed from securing meaningful relief." Some of the amici in support of Pompa argue a similar refrain. The issue we address, however, is the constitutionality of a single statute or, stated more specifically, the constitutionality of the caps on damages for noneconomic loss in R.C. 2315.18 as applied to Brandt. It is immaterial that some of the abuse in this case occurred before R.C. 2315.18's caps on damages became effective, thereby entitling Brandt to uncapped damages for noneconomic loss that she suffered from acts that occurred during that time.

{¶ 44} Nor should the jury's award of punitive damages affect the consideration of the compensatory damages awarded to Brandt. The question of punitive damages, which serve a different function in our legal system, is irrelevant here. "The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 651, 635 N.E.2d 331 (1994). Additionally, "punitive damages are separate

and apart from any remedy for a plaintiff's injuries," *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 98, and under R.C. 2315.21, a plaintiff may be entitled to both. Nothing in the relevant statutory scheme requires that compensatory damages be limited or reduced based on a separate award of punitive damages. Thus, there is no reason to consider these separate awards of damages together here.

{¶ 45} Additionally, the question whether Brandt can ultimately recover any portion of the total-damages award from Pompa is irrelevant to determining whether R.C. 2315.18 is unconstitutional as applied to Brandt and similarly situated plaintiffs. Any suggestion otherwise serves to prejudice the reader and should be seen for what it is: a distraction from the legal question before this court.

## III. CONCLUSION

{¶ 46} For the foregoing reasons, we hold that R.C. 2315.18 is unconstitutional as applied to Brandt and similarly situated plaintiffs (i.e., people like Brandt who were child victims of intentional criminal conduct and who bring civil actions to recover damages from the persons who have been found guilty of those intentional criminal acts) *to the extent that it fails to include an exception to its compensatory-damages caps for noneconomic loss for plaintiffs who have suffered permanent and severe psychological injuries.* The judgment of the Eighth District Court of Appeals is reversed, and we reinstate the jury's verdict on damages.

Judgment reversed.

DONNELLY, STEWART, and BRUNNER, JJ., concur.

KENNEDY, FISCHER, and DEWINE, JJ., dissent, with an opinion.

FISCHER, J., dissents, with an opinion.

_____

**KENNEDY, FISCHER, and DEWINE, JJ., dissenting.**

{¶ 47} Appellee Roy Pompa's abuse of appellant, Amanda Brandt, is appalling, and there is no doubt that Brandt has suffered as a result. However, as members of the third branch of government, we must "temper our empathy" and resolve legal matters within the confines of the law. *See Collins v. Sotka*, 81 Ohio St.3d 506, 512, 692 N.E.2d 581 (1998) (Moyer, C.J., dissenting). Because the majority opinion fails to do so, we must respectfully dissent.

{¶ 48} Although this case has been litigated on the questions whether the caps on compensatory noneconomic damages enacted in R.C. 2315.18 violate the Ohio Constitution's guarantees of due process of law, equal protection, trial by jury, open courts, and a remedy, the majority opinion today finds only a due-process violation of Article I, Section 16 of the Ohio Constitution. It does that by applying rational-basis review, a standard that presupposes that R.C. 2315.18 does not implicate a fundamental constitutional right. The majority opinion holds that R.C. 2315.18 violates Article I, Section 16 solely because it believes that the statute is arbitrary and unreasonable. This dissent, then, is limited to addressing that single issue. For the reasons that follow, we disagree with the determination made by the majority opinion that R.C. 2315.18 violates due-process protections.

## I. R.C. 2315.18 and the cap on noneconomic damages

{¶ 49} The General Assembly enacted R.C. 2315.18 as part a tort-reform bill that restructured the tort-damages-award system in Ohio to ensure a "fair, predictable system of civil justice." Am.Sub.S.B. 80, Section 3(A)(3), 150 Ohio Laws, Part V, 7915, 8024 ("S.B. 80"). In restructuring the tort-damages-award system, the General Assembly placed no cap on readily provable compensatory damages that represented an economic loss—e.g., pecuniary harms like lost wages, costs of medical care and treatment, and other measurable expenditures. *See* R.C. 2315.18(A)(2) and (B)(1). However, it generally capped compensatory damages for noneconomic loss—e.g., nonpecuniary harms like pain and suffering, mental anguish, and other intangible losses. *See* R.C. 2315.18(A)(4) and (B)(2).

**{¶ 50}** The legislature justified the caps on noneconomic-damages awards because it had found that noneconomic losses are difficult to quantify since they "are inherently subjective." S.B. 80, Section 3(A)(6)(d), 150 Ohio Laws, Part V, at 8028; *see also Simpkins v. Grace Brethren Church of Delaware, Ohio*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, ¶ 6. The legislature wanted to ensure that those awards were intended to compensate a person for his or her loss. *Id.* Additionally, the legislature believed that windfalls awarded to plaintiffs " 'create[d] an improper resolution of civil justice claims,' leading to increased litigation costs and insurance premiums." *Simpkins* at ¶ 6, quoting S.B. 80, Section 3(A)(6)(e), 150 Ohio Laws, Part V, at 8028. The legislature made no distinction between wrongful conduct that was negligent and wrongful conduct that was intentional—the caps were enacted to apply to the types of damages that often varied significantly based on subjective valuations. *See* S.B. 80, Section 3(A)(4) and (6), 150 Ohio Laws, Part V, at 8024-8028.

**{¶ 51}** The General Assembly did, however, provide exceptions to the cap on compensatory noneconomic damages. R.C. 2315.18(B)(3); *see also* S.B. 80, Section 3(A)(6)(c), 150 Ohio Laws, Part V, at 8027-8028. The cap does not apply when the victim has sustained (1) an injury that resulted in "[p]ermanent and substantial physical deformity," (2) an injury that resulted in "loss of use of a limb," (3) an injury that resulted in "loss of a bodily organ system," or (4) a "[p]ermanent physical functional injury that permanently prevents the person from being able to independently care for [him or her]self and perform life-sustaining activities." R.C. 2315.18(B)(3). So unless the victim has suffered from an injury that falls under one of the exceptions listed in R.C. 2315.18(B)(3), the victim's compensatory noneconomic-damages award will be capped under R.C. 2315.18(B)(2).

**{¶ 52}** In *Arbino v. Johnson & Johnson*, we summarized the General Assembly's evidence and findings as they pertained to R.C. 2315.18:

> In an uncodified section of S.B. 80, [the General Assembly] found that the current state of the civil litigation system "represents a challenge to the economy of the state of Ohio." S.B. 80, Section 3(A)(1), 150 Ohio Laws, Part V, 8024. This finding was supported by (1) a National Bureau of Economic Research study showing that states adopting tort reforms experienced growth in employment, productivity, and total output, (2) a 2002 White House Council on Economic Advisors study equating the cost of tort litigation to a 2.1 percent wage and salary tax, a 1.3 percent personal-consumption tax, and a 3.1 percent capital-investment-income tax, (3) a Harris Poll of 928 senior corporate attorneys showing that the litigation environment in a state greatly affected the business decisions of their companies, (4) a Tillinghast–Towers Perrin study showing that the tort system failed to return even 50 cents for every dollar to injured plaintiffs and that the cost of the national tort system grew at a record rate in 2001, with a cost equivalent to a five percent tax on wages, and (5) testimony from Ohio Department of Development Director Bruce Johnson on the rising costs of the tort system, which he believed were putting Ohio businesses at a disadvantage and hindering development. S.B. 80 at Section 3(A)(3)(a) through (f), 150 Ohio Laws, Part V, [8024-8025].

116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 53.

## II. R.C. 2315.18, as applied to Brandt, does not violate her right to due process of law under Article I, Section 16 of the Ohio Constitution

{¶ 53} In an as-applied challenge, Brandt argues that the cap imposed on her noneconomic-damages award under R.C. 2315.18 violates her right to due process. To prevail, Brandt must prove by clear and convincing evidence that the

24

statute is unconstitutional when applied to her particular set of facts. *See Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37-38. She simply cannot meet this burden.

{¶ 54} In reviewing this constitutional claim, we must remember that legislative enactments enjoy a *strong presumption* of constitutionality. *See State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142, 128 N.E.2d 59 (1955), paragraph one of the syllabus. This court does not consider the "policy or wisdom of a statute" in these determinations. *State ex rel. Bishop v. Bd. of Edn. of Mt. Orab Village School Dist., Brown Cty.*, 139 Ohio St. 427, 438, 40 N.E.2d 913 (1942). Our "sole function" is to determine whether the statute "transcends the limits of legislative power." *Id.*

{¶ 55} The right to due process of law in Ohio exists under Article I, Section 16 of the Ohio Constitution: "[E]very person, for an injury done him in his land, goods, person, or reputation, *shall have remedy* by *due course of law* * * *." (Emphasis added.) It has been considered the functional equivalent of the "due process of law" protections in the United States Constitution. *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 48.

{¶ 56} The standard of review we apply when reviewing the constitutionality of a statute on due-process grounds depends on whether the legislation restricts a fundamental right. *Arbino* at ¶ 49. By applying rational-basis review, the majority opinion has implicitly decided that R.C. 2315.18 does not implicate a fundamental right. We agree that rational-basis review is the appropriate test to be applied in these circumstances—that is the conclusion this court reached in *Arbino*. *See id.*

{¶ 57} R.C. 2315.18 is afforded "a strong presumption of validity" and will survive a due-process challenge if it is rationally related to a legitimate government purpose. *Heller v. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). "This deferential rational-basis standard is 'a paradigm of judicial

restraint,' *Fed. Communications Comm. v. Beach Communications, Inc.*, 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993), and 'not a license for courts to judge the wisdom, fairness, or logic of legislative choices,' *id.* at 313, 113 S.Ct. 2096." *State v. Bevly*, 142 Ohio St.3d 41, 2015-Ohio-475, 27 N.E.3d 516, ¶ 35 (French, J., dissenting). Our system of government presumes that the democratic process will rectify bad policy decisions and that "judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979).

**{¶ 58}** Therefore, a statute does not violate due process under the rational-basis test if the statute (1) "bears a real and substantial relation to the public health, safety, morals or general welfare of the public," and (2) "is not unreasonable or arbitrary." *Benjamin v. Columbus*, 167 Ohio St. 103, 146 N.E.2d 854 (1957), paragraph five of the syllabus. "Whether an exercise of the police power does bear a real and substantial relation to the public health, safety, morals or general welfare of the public and whether it is unreasonable or arbitrary are questions which are committed in the first instance to the judgment and discretion of the legislative body, and, unless the decisions of such legislative body on those questions appear to be clearly erroneous, the courts will not invalidate them." *Id*. at paragraph six of the syllabus; *see also Simpkins*, 149 Ohio St. 3d 307, 2016-Ohio-8118, 75 N.E.3d 122, at ¶ 47, quoting *State v. Williams*, 88 Ohio St.3d 513, 531, 728 N.E.2d 342 (2000) (we grant " "substantial deference' " to the General Assembly's determination).

*A. R.C. 2315.18(B) bears a real and substantial relation to the general welfare of the public*

**{¶ 59}** The General Assembly enacted S.B. 80 to protect the Ohio economy from the increasing number of tort claims being filed and the increasing amounts of the damages being awarded in those claims, both of which were negatively impacting the cost of doing business in the state, threatening Ohio jobs, driving up

consumer costs, and stifling innovation. S.B. 80, Section 3(A)(3), 150 Ohio Laws, Part V, at 8024. Part of the issue was the cost of the tort system—it had grown significantly, and attorneys benefitted more from the system than those who had been injured. S.B. 80, Section 3(A)(3)(a) through (f), 150 Ohio Laws, Part V, at 8024-8025. The General Assembly also noted the significant problem with damages, specifically noneconomic damages and punitive damages. S.B. 80, Section 3(A)(4) and (6), 150 Ohio Laws, Part V, at 8025-8028. The General Assembly was concerned about "[i]nflated damage[s] awards," i.e., windfalls that a person could derive from awards of both punitive and noneconomic damages. S.B. 80, Section 3(A)(6)(e), 150 Ohio Laws, Part V, at 8027.

{¶ 60} Noneconomic-damages awards, like the one at issue here, were intended to compensate an injured person for a loss, not to punish the defendant. S.B. 80, Section 3(A)(6)(a), 150 Ohio Laws, Part V, at 8027. The General Assembly noted, however, that these damages, which have "no precise economic value," *id.*, are inherently subjective and may be influenced by "improper consideration of evidence of wrongdoing," S.B. 80, Section 3(A)(6)(d), 150 Ohio Laws, Part V, at 8027. It is these inflated noneconomic-damages awards that contributed to the problems in our civil-justice system. *See* S.B. 80, Section 3(A)(6)(e), 150 Ohio Laws, Part V, at 8028. Thus, the General Assembly capped noneconomic-damages awards at "the greater of [$250,000] or an amount that is equal to three times the economic loss, as determined by the trier of fact," but not exceeding $350,000 for each plaintiff in the tort action or $500,000 for each occurrence that is the basis of the action. R.C. 2315.18(B)(2).

{¶ 61} The majority opinion never says that reforming the tort system to advance the goal of preventing inflated and improperly punitive noneconomic-damages awards bears no real and substantial relation to the public health, safety, morals, or general welfare of the public. Nor can it. This court has already found that S.B. 80 "bears a real and substantial relation to the general welfare of the

public." *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 58. Reducing the cost of doing business in this state, ensuring job growth, reducing costs to consumers, and promoting innovation plainly have a real and substantial relation to the general welfare of the public and the economic health of this state.

{¶ 62} Brandt argues, however, that the economic research on which the General Assembly based its decision to enact R.C. 2315.18 was flawed. In *Arbino*, this court rejected that argument, finding that the General Assembly had made several findings of fact based on its own research. *Arbino* at ¶ 53. We explained that in determining whether a statute bears a real and substantial relation to legitimate governmental interests, " 'it is not the function of the courts to substitute their evaluation of legislative facts for that of the legislature.' " *Id.* at ¶ 58, quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). The General Assembly, with the research available to it, made the decision to enact these caps to protect the Ohio economy. There is no doubt that this statute bears a real and substantial relation to a legitimate government purpose, even under Brandt's circumstances.

{¶ 63} "[T]he status of the plaintiff [as a victim of sexual assault] does not diminish either the economic benefits of limiting noneconomic damages, as found by the General Assembly, or the substantial relationship that we found in *Arbino* between the statutory limitations and the benefits to the general public welfare." *Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, at ¶ 38. Therefore, the first element of the rational-basis test—that the challenged statute bears a real and substantial relation to the general public welfare—is satisfied. *See Arbino* at ¶ 55.

*B. R.C. 2315.18 is not unreasonable or arbitrary, and there is a rational basis for its creation of two classes of victims*

{¶ 64} As for whether the cap on noneconomic damages is unreasonable or arbitrary as applied to Brandt, or whether there is no rational basis for

distinguishing between victims who have suffered (1) an injury resulting in "[p]ermanent and substantial physical deformity," (2) an injury resulting in "loss of use of a limb," (3) an injury resulting in "loss of a bodily organ system" or (4) a "[p]ermanent physical functional injury that permanently prevents the person from being able to independently care for [him or her]self and perform life-sustaining activities," R.C. 2315.18(B)(3), from those who have not, those arguments too must fail.

{¶ 65} The majority opinion concludes that the statutory scheme is unreasonable. The majority opinion discusses how the statute does not consider psychological injuries at all and how R.C. 2315.18(B)(3) is limited to physical "catastrophic injuries." Majority opinion, ¶ 31. The majority opinion maintains that this distinction is unreasonable given the trauma that Brandt has endured, evidenced by the jury's high-dollar award for her noneconomic damages and the fact that no one has argued that this award was excessive for reasons other than its exceeding the statutory cap. The majority opinion concludes that "unavailability of the exception to the compensatory-damages caps for the most severely and permanently *psychologically* injured" creates a due-process problem. (Emphasis sic.) *Id.*

{¶ 66} But in enacting tort-reform legislation, the General Assembly was required only to be rational and unarbitrary. This is a low bar. And here, the legislature sought to limit inflated and subjective awards that it found to be both unfair to defendants and harmful to the state's economy. It also created categories of injury that, it believed, did not raise the same concerns for runaway verdicts and subjective awards, because the nature of the injury would assure that the damages award would not be based on improper considerations and could be more objectively valued by a jury. In order to effectively enact legislation that solves the problems that the General Assembly found to exist, the legislature was required to draw lines somewhere. As this court said in *Arbino*, "the General Assembly is

charged with making the difficult policy decisions on such issues and codifying them into law.  This court is not the forum in which to second-guess such legislative choices * * *."  116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 71.

{¶ 67} R.C. 2315.18 draws distinctions between the types of injured claimants, but those distinctions are not arbitrary or irrational.  The statute prohibits caps from being imposed on those who have suffered (1) an injury resulting in "[p]ermanent and substantial physical deformity," (2) an injury resulting in the "loss of use of a limb," (3) an injury resulting in the "loss of a bodily organ system," or (4) a "[p]ermanent physical functional injury that permanently prevents the person from being able to independently care for [him or her]self and perform life-sustaining activities."  R.C. 2315.18(B)(3).  There are two categories of plaintiffs: those who fall into one of the four exceptions set forth in R.C. 2315.18(B)(3) and those who do not.  The classification remains the same regardless of the age of the victim and the nature of the tort.  *Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, at ¶ 50.  The statute does not treat Brandt or other victims of sexual assault any differently than other tort victims who have not experienced one of the four types of injuries listed above.

{¶ 68} The majority opinion and Brandt seem to emphasize that a minor victim of sexual assault could never fall into one of these categories.  This is simply untrue.  We need not speculate, but it is apparent that a victim of sexual assault could experience an injury of the sort covered under R.C. 2315.18(B)(3)—e.g., an injury caused by the violence of the assault, a resulting sexually transmitted disease, complications of a pregnancy occasioned by the assault that result in the "loss of a bodily organ system," or another injury that results in  a "permanent physical functional injury that permanently prevents the person from being able to independently care for [him or her]self and perform life-sustaining activities."  *See, e.g.*, *Ozmun v. Customer Engineering Servs., L.L.C.*, Cuyahoga C.P. No. CV 14 824745, 2015 WL 13238578 (July 31, 2015) (allowing the jury to determine

whether the damages cap applied after a plaintiff offered an expert report finding that her posttraumatic stress disorder was a physical, functional injury because it caused physical harm, including brain-cell damage and atrophy to the hippocampal gyrus and other areas of the brain); *see also Giebel v. Lavalley*, N.D.Ohio No. 5:12-CV-750, 2013 WL 6903784, *2 (genuine issue of material fact whether the plaintiff who suffered depression and suicidal thoughts as a result of a brain injury suffered an injury under R.C. 2315.18(B)(3)(b) that exempted her from the cap on noneconomic damages). No one is denying that Brandt's experience was traumatic and that she suffers from psychological issues, but her injuries do not fall within one of the categories of injuries identified by the General Assembly as being exempt from the caps on noneconomic damages. If they did, then Brandt would not be subject to a cap on her award of noneconomic damages. This is the same for any other claimant whose injuries do not rise to the extent specified by the legislature.

{¶ 69} As the General Assembly recognized, damages for things like pain and suffering and mental anguish are inherently subjective. They are difficult to determine and quantify. *See Leininger v. United States*, 499 F.Supp.3d 973, 997 (D.Kan.2020) ("non-economic damages are notoriously difficult to quantify"). The General Assembly had a substantial interest in protecting our civil-justice system and our economy when it enacted the statute that set a cap on noneconomic damages as a means to limit the awards for injuries that are either difficult to prove or the extent of which is difficult to quantify without evidence of some physical component. This is a reasonable and legitimate government interest, and the General Assembly has not arbitrarily selected winners and losers under the statute. Thus, R.C. 2315.18(B) does not violate due process merely because it caps the noneconomic-damages award issued to Brandt in the same way that it would cap damages for every other injured person who does not fall into one of the four categories for which caps are exempted.

{¶ 70} " '[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because " ' " ' "it is not made with mathematical nicety or because in practice it results in some inequality.' " ' " *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 87 Ohio St.3d 55, 58, 717 N.E.2d 286 (1999), quoting *Heller*, 509 U.S. at 321, 113 S.Ct. 2637, 125 L.Ed.2d 257, quoting *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911). That the distinctions drawn may not be perfect does not make them irrational or arbitrary. And the majority opinion does not dispute that lines must be drawn—it simply disagrees with how the General Assembly drew them.

{¶ 71} The majority opinion argues that by finding the noneconomic-damages cap constitutional, Brandt's abuser, Pompa, would be the only winner here. The majority opinion also emphasizes that denying Brandt the full amount of her noneconomic-damages award in this case is unreasonable since the award does not impact the insurance industry, because most insurance policies now contain exclusions that restrict coverage for criminal conduct such as Pompa's. This rationale is flawed for two reasons. First, noneconomic-damages awards are not meant to punish the defendant, S.B. 80, Section 3(A)(6)(a), 150 Ohio Laws, Part V, at 8027; the fact that one bad person might benefit from caps on noneconomic damages does not make the statute, taken as a whole, irrational or arbitrary. Second, the majority opinion's policy rationale does not belong in a constitutionality analysis at all; policy decisions are reserved for the General Assembly. *See Cleveland*, 157 Ohio St.3d 330, 2019-Ohio-3820, 136 N.E.3d 466, at ¶ 40. It is up to the General Assembly to change the statute if it is no longer in line with public interest. We can only bring the issue to the attention of the General Assembly; we cannot "invade the province of the legislature" and "violate the

separation of powers" doctrine to rewrite the statute in the manner we find most appropriate. *Pratte v. Stewart*, 125 Ohio St.3d 473, 2010-Ohio-1860, 929 N.E.2d 415, ¶ 54. We "must leave it to the General Assembly to rewrite the statute if it deems necessary." *Id.*

{¶ 72} Minor sex-abuse victims are worthy of protection and compensation. But it is not our role as members of the judicial branch to determine what compensation is necessary or adequate. The General Assembly is the ultimate arbiter of public policy. *Cleveland* at ¶ 40. If the General Assembly would like to create another exception beyond those listed in R.C. 2315.18(B)(3), then it should do so. *See Pratte* at ¶ 54. If the people would like another exception added to the statute, then they should go to their legislators or pursue a referendum under Article II, Section 1b or 1c of the Ohio Constitution. But that is a far cry from the determination in the majority opinion that if legislation tackles problems in the tort system, it *must* treat the survivors of sexual abuse the same as it treats people who have, for example, lost an organ or a limb. The General Assembly could rationally decide that the types of injuries described in R.C. 2315.18(B)(3) do not present the same problems for ensuring that noneconomic-damages awards are not windfalls or are not inherently subjective. That is all the Constitution requires.

### III. Conclusion

{¶ 73} No one denies that child abuse is horrific. And no one will deny that Brandt has suffered. But it is not our job as members of the judicial branch to overreach and invade the province of the General Assembly. Bad facts make bad law, as it does today.

{¶ 74} By resolving the merits of this case, the majority opinion improperly involves the judiciary in matters that belong exclusively and fundamentally to the General Assembly. It is this type of result-oriented judicial activism that blurs the line in the public's eye about which branch of government is truly responsible for the policies of this state. It erodes the public's confidence in the judiciary to resolve

problems within the confines of the law and places an unrealistic expectation on the members of the Ohio judiciary to resolve all society's problems. Policy-making is not our job. If policy changes are desired, then the members of the majority opinion can take the short walk to Capitol Square to speak with their legislators—the people who are elected to create and set policy for Ohioans. Brandt's situation is certainly sad, but we cannot provide her with compensation simply because it may be our personal policy preference to do so. This activism from the bench needs to stop.

{¶ 75} Brandt has not demonstrated that R.C. 2315.18(B) is unconstitutional as applied to her. Thus, we must respectfully dissent.

_____

**FISCHER, J., dissenting.**

{¶ 76} The majority opinion abandons this court's role as impartial jurist and exceeds the scope of its authority to hold that R.C. 2315.18(B)(2) is unconstitutional as applied to appellant, Amanda Brandt, and similarly situated victims. What happened to Brandt is horrific and deeply saddening, as are the stories of every child victim—really any victim—of sexual assault. But that reality does not bestow upon this court the constitutional authority to invade the purview of the General Assembly by questioning its policy decisions and fashioning remedies for victims we deem worthy. While these types of cases turn our stomachs and tug on our heartstrings, we are still tasked with resolving these matters within the confines of the law.

{¶ 77} As discussed in the joint dissent, I fully agree that Brandt cannot demonstrate that the caps on noneconomic damages in R.C. 2315.18(B)(2), as applied to her, violate her right to due process under Article I, Section 16 of the Ohio Constitution. I write separately to address Brandt's other arguments that go unresolved by the majority opinion, and I reach the conclusion that Brandt cannot demonstrate that R.C. 2315.18 is unconstitutional on its face or as applied to her. Thus, I would affirm the judgment of the Eighth District Court of Appeals.

## I. Standard of Review

{¶ 78} It is important to address the applicable standards of review in this case given that the majority opinion seems to have forgotten how to apply them. Constitutional challenges fall into one of two categories: (1) facial challenges that claim a statute as a whole is unconstitutional, and (2) as-applied challenges that claim a statute is unconstitutional as applied to a particular set of facts. *In re D.B.*, 129 Ohio St.3d 104, 2011-Ohio-2671, 950 N.E.2d 528, ¶ 12; *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37.

{¶ 79} In a facial challenge, the party must prove beyond a reasonable doubt that "there exists no set of circumstances under which the statute would be valid." *Id.*; *see also State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142, 128 N.E.2d 59 (1955), paragraph one of the syllabus; *State v. Mason*, 153 Ohio St.3d 476, 2018-Ohio-1462, 108 N.E.3d 56, ¶ 5 (same). But for an as-applied challenge, the party must prove by clear and convincing evidence that the statute is unconstitutional when applied to a particular set of facts. *Harrold* at ¶ 38; *Belden v. Union Cent. Life Ins. Co.*, 143 Ohio St. 329, 55 N.E.2d 629 (1944), paragraph six of the syllabus.

## II. Presumption of Constitutionality

{¶ 80} When evaluating these constitutional challenges, we must remember that legislative enactments enjoy a *strong presumption* of constitutionality. *Dickman* at paragraph one of the syllabus. While this presumption has been subject to some limited criticism in the past, *see Ohio Grocers Assn. v. Levin*, 123 Ohio St.3d 303, 2009-Ohio-4872, 916 N.E.2d 446, ¶ 70, (Pfeifer, J., dissenting), it is firmly based on the General Assembly's plenary power to legislate, and it serves to discourage courts from overruling legislation based on the court's own policy preferences. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 167 Ohio St.3d 255, 2022-Ohio-65, 192 N.E.3d 379, ¶ 339 (Fischer, J., dissenting). Indeed, this court has applied this presumption since our statehood and has affirmed this presumption even through the various amendments to our state constitution.

To show how deeply rooted this presumption is in our judicial system, a brief history is necessary.

{¶ 81} The Ohio Constitution of 1803, drafted consistently with Jeffersonian principles, concentrated much of the state's power in the General Assembly. *See* Utter, Judicial Review in Early Ohio, The Mississippi Valley Historical Review, Vol. XIV, No. 1 (June 1927) 3-24. The legislature controlled the makeup of the judiciary. *Id.* at 4, 6-7. And the legislature believed that the court had no right at all to declare its enactments unconstitutional. *Id.*

{¶ 82} However, the Ohio Supreme Court determined in *Rutherford v. M'Faddon* (1807), that it had the authority to review the constitutionality of legislative acts. Pollack, *Ohio Unreported Judicial Decisions Prior to 1823*, Part II, 71-105 (1952) In *Rutherford*, the court expressed that the judiciary's duty is to "*expound, construe* and *declare* the law," which includes declaring a law unconstitutional. (Emphasis sic.) *Id.* at 72-73. And in discharging that duty, the court "compare[s] the legislative *act* with the *constitution*," and if it is determined that the legislative act is contrary to the Constitution or prohibited by the Constitution, then it is void. (Emphasis sic.) *Id.* at 73. The court emphasized that its role is to support the Constitution. *Id.* at 74.

{¶ 83} The judiciary continued to exercise its authority, but it provided deference to the General Assembly in its legislative decisions: "It is never to be forgotten, that the presumption is always in favor of the validity of the law; and it is only when manifest assumption of authority, and a clear incompatibility between the constitution and the law appear, that the judicial power can refuse to execute it. Such interference can never be permitted in a doubtful case." *Cincinnati, Wilmington and Zanesville, RR. Co. v. Clinton Cty. Commrs.*, 1 Ohio St. 77, 82 (1852); *see also* Downes, Judicial Review Under the Ohio Constitution of 1802, Northwest Ohio Quarterly (October 1946) 145.

**{¶ 84}** This shift, however, was not due to a fear of impeachment by the General Assembly nor the court deciding to give up its authority; this shift was founded in the court's recognition that legislators took an "oath to support the constitution," and they considered that oath when crafting legislation. *Cincinnati, Wilmington and Zanesville, RR. Co.*, at 83; Downes at 145. If the court were to entertain declaring a law unconstitutional "while [also] entertaining doubts upon the subject," then it would present a separation of powers problem and "make the dubious constructions of the judiciary[] outweigh the fixed conclusions of the General Assembly." *Id.* The court noted that " 'it is not on slight implication and vague conjecture' " that it would pronounce that the General Assembly had " 'transcended its powers' " and declared its acts void. *Cincinnati, Wilmington and Zanesville, RR. Co.* at 84, quoting *Fletcher v. Peck*, 10 U.S. 87, 128, 3 L.Ed. 162 (1810).

**{¶ 85}** Even as the Ohio Constitution was amended to distribute power more equally among the three branches of government in 1851, this court still gave a strong presumption to the constitutionality of statutory enactments. *See, e.g.*, *Ex parte Bushnell*, 9 Ohio St. 77, 96 (1859) ("No court will hold a law to be unconstitutional unless its unconstitutionality is clear beyond a doubt"). And by 1894, it was a settled rule that the court presumed constitutionality in favor of the validity of the challenged statute. *State ex rel. Poe v. Jones*, 51 Ohio St. 492, 503, 37 N.E. 945 (1894). In reaffirming this rule, this court again emphasized that the presumption is necessary due to the General Assembly's plenary power to legislate: "The legislative power of the state is vested in the general assembly, and whatever limitation is placed upon the exercise of that plenary grant of power must be found in a clear prohibition by the constitution." *Id.* When "the constitutionality of the law is involved in doubt, that doubt must be resolved in favor of the legislative power." *Id.*

**{¶ 86}** The presumption of constitutionality remained strong even after the Ohio Constitution was revised in 1912 to provide the judiciary with more, yet still limited, power to review legislative enactments. *See Dickman*, 164 Ohio St. 142, 128 N.E.2d 59, at paragraph one of the syllabus; Article IV, Section 2, Ohio Constitution (1912) (amended to allow the Supreme Court to find a statute unconstitutional by a majority of all but one vote). This court ruled still that legislative enactments were presumed to be constitutional and would only be deemed unconstitutional if proven so beyond a reasonable doubt. *Dickman* at 147-151; *Williams v. Scudder*, 102 Ohio St. 305, 131 N.E. 481 (1921), paragraph four of the syllabus; *Xenia v. Schmidt*, 101 Ohio St. 437, 130 N.E. 24 (1920), paragraph one of the syllabus.

**{¶ 87}** Even after the people of Ohio adopted the Modern Courts Amendment in 1968, which eliminated the restriction on this court's ability to find a statute unconstitutional by a certain majority, *see Euclid v. Heaton*, 15 Ohio St.2d 65, 66, 238 N.E.2d 790 (1968), and provided this court with appellate jurisdiction involving constitutional questions, Article IV, Section2(B)(2)(a)(ii), Ohio Constitution, the presumption of a statute's constitutional validity still reigned. This is because the presumption was always meant to ensure the separation of powers and to support the General Assembly's plenary power to legislate, a power that was not altered by the Modern Courts Amendment. *See Village of Monroeville v. Ward*, 27 Ohio St.2d 179, 182, 271 N.E.2d 757, 759 (1971)*, rev. on other grounds by Ward v. Monroeville*, 409 U.S. 57, 93 Sc.D. 80, 34 L.Ed.2d 267 (1972), citing *State ex rel. Poe* at 503; *see generally* Fischer et al., The Modern Courts Amendment at 50, Ohio Lawyer (Oct.-Dec. 2019) 12-15; O'Connor, The Ohio Modern Courts Amendment: 45 Years of Progress, 76 Alb.L.Rev. 1963 (2012-2013); Milligan & Pohlman, The 1968 Modern Courts Amendment to the Ohio Constitution, 29 Ohio St.L.J. 811 (1968).

**{¶ 88}** This presumption of constitutionality has been affirmed time and again since 1968. *Ohio Pub. Interest Action Group, Inc. v. Pub. Util. Comm.*, 43 Ohio St.2d 175, 331 N.E.2d 730 (1975), paragraph four of the syllabus ("The question of the constitutionality of every law being first determined by the General Assembly, every presumption is in favor of its constitutionality, and it must clearly appear that the law is in direct conflict with inhibitions of the Constitution before a court will declare it unconstitutional"), following *State Bd. of Health v. Greenville*, 86 Ohio St.1, 98 N.E. 1019 (1912); *State ex rel. Swetland v. Kinney*, 69 Ohio St.2d 567, 576, 433 N.E.2d 217 (1982) (the sanctity of legislative enactments is firmly entrenched in our judicial system); *State v. Warner*, 55 Ohio St.3d 31, 43, 564 N.E.2d 18 (1990) (recognizing that the presumption of constitutionality is based on the legislature's plenary power); *see also State ex rel. Horner v. Anderson*, 41 Ohio St.2d 166, 172, 324 N.E.2d 572 (1975); *State ex rel. Taft v. Campanella,* 50 Ohio St.2d 242, 246, 364 N.E.2d 21 (1977); *State v. Renalist, Inc.*, 56 Ohio St.2d 276, 278, 383 N.E.2d 892 (1978); *Cincinnati City School Dist. Bd. of Edn. v. Walter*, 58 Ohio St.2d 368, 376, 390 N.E.2d 813 (1979); *State v. Saurman*, 64 Ohio St.2d 137, 138, 413 N.E.2d 1197 (1980); *State v. Dorso*, 4 Ohio St.3d 60, 61, 446 N.E.2d 449 (1983); *Ewing v. Lindley*, 23 Ohio St.3d 222, 224, 492 N.E.2d 435 (1986); *State v. Stambaugh*, 34 Ohio St.3d 34, 35, 517 N.E.2d 526 (1987); *Doyle v. Ohio Bur. of Motor Vehicles*, 51 Ohio St.3d 46, 47, 554 N.E.2d 97 (1990); *Conley v. Shearer*, 64 Ohio St.3d 284, 289, 595 N.E.2d 862 (1992); *Sorrell v. Thevenir*, 69 Ohio St.3d 415, 418, 633 N.E.2d 504 (1994); *Beagle v. Walden*, 78 Ohio St.3d 59, 61, 676 N.E.2d 506 (1997); *Hughes v. Ohio Bur. of Motor Vehicles*, 79 Ohio St.3d 305, 307, 681 N.E.2d 430 (1997); *Desenco, Inc. v. Akron*, 84 Ohio St.3d 535, 538, 706 N.E.2d 323 (1999); *State ex rel. Haylett v. Ohio Bur. of Workers' Comp.*, 87 Ohio St.3d 325, 328, 720 N.E.2d 901 (1999); *Klein v. Leis*, 99 Ohio St.3d 537, 2003-Ohio-4779, 795 N.E.2d 633, ¶ 4; *Yajnik v. Akron Dept. of Health, Hous. Div.*, 101 Ohio St.3d 106, 2004-Ohio-357, 802 N.E.2d 632, ¶ 16; *McCrone v. Bank One*

*Corp.*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, ¶ 20; *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 20; *State v. Carswell*, 114 Ohio St.3d 210, 2007-Ohio-3723, 871 N.E.2d 547, ¶ 6-7; *Toledo v. Tellings*, 114 Ohio St.3d 278, 2007-Ohio-3724, 871 N.E.2d 1152, ¶ 22; *Ohio Apt. Assn. v. Levin*, 127 Ohio St.3d 76, 2010-Ohio-4414, 936 N.E.2d 919, ¶ 56; *Cleveland v. State*, 128 Ohio St.3d 135, 2010-Ohio-6318, 942 N.E.2d 370, ¶ 6; *State ex rel. Zeigler v. Zumbar*, 129 Ohio St.3d 240, 2011-Ohio-2939, 951 N.E.2d 405, ¶ 24;*Mahoning Edn. Assn. of Dev. Disabilities v. State Emp. Relations Bd.*, 137 Ohio St.3d 257, 2013-Ohio-4654, 998 N.E.2d 1124, ¶ 13; *Haight v. Minchak*, 146 Ohio St.3d 481, 2016-Ohio-1053, 58 N.E.3d 1135, ¶ 11; *State v. Noling*, 149 Ohio St.3d 327, 2016-Ohio-8252, 75 N.E.3d 141, ¶ 10; *Toledo v. State*, 154 Ohio St.3d 41, 2018-Ohio-2358, 110 N.E.3d 1257. ¶ 17-18. Even this year, this court drew on this presumption to evaluate the constitutionality of challenged statutes. *See Newburgh Hts. v. State*, ___ Ohio St.3d ___, 2022-Ohio-1642, ___ N.E.3d ___, ¶ 19; *State v. Grevious*, ___ Ohio St. ___, 2022-Ohio-4361, ___ N.E. ___, ¶ 9. Indeed, this presumption is consistent with the General Assembly's statement that it enacts statutes with the Ohio and United States Constitutions in mind. *See* R.C. 1.47(A).

{¶ 89} This deeply-rooted presumption is vital to maintaining separation of powers. *See Cincinnati, Wilmington and Zanesville, RR. Co. v.* at 83-84; *State ex rel. Poe*, 51 Ohio St. at 503, 37 N.E. 945; *Ohio Pub. Interest Action Group, Inc.* at paragraph four of the syllabus; *State ex rel. Swetland* at 576; *Warner* at 43. The presumption not only recognizes the General Assembly's plenary power to legislate—to enact laws consistent with the will of the people—it ensures that judges do not replace the legislature's views with their own personal views. *See League of Women Voters of Ohio*, 167 Ohio St.3d 255, 2022-Ohio-65, 192 N.E.3d 379, at ¶ 339 (Fischer, J., dissenting); The Federalist No. 78, at 468-469 (Alexander

Hamilton) (Clinton Rossiter Ed.1961); *see also Holeton v. Crouse Cartage Co.*, 92 Ohio St.3d 115, 135, 748 N.E.2d 1111 (2001) (Moyer, C.J., dissenting).

{¶ 90} Thus, when evaluating constitutional claims, we must make *every reasonable presumption* and resolve any doubt as to the statute's constitutionality *in favor of the validity* of the statue. *Dickman*, 164 Ohio St. at 149, 128 N.E.2d 59; *see State ex rel. Doerfler v. Price*, 101 Ohio St. 50, 53, 128 N.E. 173 (1920). Policy considerations raised by members of the judicial branch have no place in this analysis. *State ex rel. Bishop v. Mt. Orab Village School Dist. Bd. of Edn.*, 139 Ohio St. 427, 438, 40 N.E.2d 913 (1942).

**III. We have already held that R.C. 2315.18 is constitutional on its face**

{¶ 91} This court held that R.C. 2315.18 was constitutional on its face in *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 114. Brandt maintains that this court's decision in *Arbino* was wrong; she argues that R.C. 2315.18 violates due process, equal protection, and the right to trial by jury and is therefore unconstitutional on its face. Though the majority opinion declines to address this issue, its silence and use of the rational-basis test is confirmation that *Arbino* should be affirmed. Indeed, stare decisis demands that we affirm and follow *Arbino*.

{¶ 92} Stare decisis "dictates adherence to prior judicial decisions." *State v. Harper*, 160 Ohio St.3d 480, 2020-Ohio-2913, 159 N.E.3d 248, ¶ 38. It provides constancy and consistency in the law necessary to ensure that the value of law in society is not diminished. *Scott v. News-Herald*, 25 Ohio St.3d 243, 249, 496 N.E.2d 699 (1986). So generally, we are "institutionally bound to uphold our prior decisions where time has vindicated the logic utilized to render the holding." *Id.*

{¶ 93} We can, of course, reverse our precedent under the right circumstances: "(1) the decision was wrongly decided at that time, or changes in circumstances no longer justify continued adherence to the decision; (2) the decision defies practical workability; and (3) abandoning the precedent would not

create an undue hardship for those who have relied upon it." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, paragraph one of the syllabus. If we apply the test set forth in *Galatis*, Brandt plainly cannot satisfy the third element, because *Arbino* is the foundation of many decisions and abandoning it would clearly create an undue hardship for those who have relied on it.

**{¶ 94}** Over the past 15 years, we have reaffirmed and relied on *Arbino* numerous times. Besides supporting the holding in *Simpkins v. Grace Brethren Church of Delaware*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, at ¶ 49, *Arbino* has formed the legal foundation for affirming legislative limits on allowable damages in many constitutional claims. *See, e.g.*, *Groch v. Gen. Motors Corp.* 117 Ohio St.3d 192, 2008-Ohio-546, 883 N.E.2d 377, ¶ 23 (*Arbino* is "useful in setting the stage" to provide "extensive background" and establishing "some important concepts that play a significant role" in resolving questions regarding the constitutionality of R.C. 2305.10, a products-liability statute of repose); *Oliver v. Cleveland Indians Baseball Co. Ltd. Partnership*, 123 Ohio St.3d 278, 2009-Ohio-5030, 915 N.E.2d 1205, ¶ 7-16 (relying on *Arbino* to affirm the constitutionality of R.C. 2744.05(C)(1), a statute that limits noneconomic damages in suits against political subdivisions); *Kaminski v. Metal & Wire Prods. Co.*, 125 Ohio St.3d 250, 2010-Ohio-1027, 927 N.E.2d 1066, ¶ 58-97 (relying on *Arbino* to determine that R.C. 2745.01, which limits an employer's liability for intentional torts, is constitutional); *Stetter v. R.J. Corman Derailment Servs., L.L.C.*, 125 Ohio St.3d 280, 2010-Ohio-1029, 927 N.E.2d 1092, ¶ 33-93 (same); *Flagstar Bank, F.S.B. v. Airline Union's Mtge. Co.*, 128 Ohio St.3d 529, 2011-Ohio-1961, 947 N.E.2d 672, ¶ 29 (citing *Arbino* to conclude that the Ohio Constitution's right-to-remedy clause protects only against laws that completely foreclose a cause of action for injured plaintiffs or otherwise eliminate their ability to receive a meaningful remedy).

**{¶ 95}** *Arbino* also helps explain and emphasizes the importance of stare decisis in Ohio. *See, e.g.*, *State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, ¶ 33. And *Arbino* properly sets forth the role of this court as an arbiter of legal issues, not as a policymaker. *See, e.g.*, *Cincinnati City School Dist. Bd. of Edn. v. Conners*, 132 Ohio St.3d 468, 2012-Ohio-2447, 974 N.E.2d 78, ¶ 17; *Pratte v. Stewart*, 125 Ohio St.3d 473, 2010-Ohio-1860, 929 N.E.2d 415, ¶ 54. To overrule *Arbino* would be to destroy the very foundation on which these decisions stand—a fact acknowledged by Brandt's counsel at oral argument.

**{¶ 96}** Furthermore, *Arbino* was not wrongly decided. The crux of Brandt's argument is that R.C. 2315.18 violates her right to trial by jury under Article I, Section 5 of the Ohio Constitution. She argues that the statute requires the trial-court judge to disregard the jury's noneconomic-damages award, thereby rendering her jury award meaningless. Her argument, however, is based on a misunderstanding about the jury's right to determine damages as a matter of fact and the court's ability to review and modify a damages award as a matter of law.

**{¶ 97}** Under Article I, Section 5 of the Ohio Constitution, the right to a jury trial "shall be inviolate." We have determined that the right is fundamental and cannot be invaded or violated by legislative act or judicial order. *Shimko v. Lobe*, 103 Ohio St.3d 59, 2004-Ohio-4202, 813 N.E.2d 669, ¶ 28; *Gibbs v. Girard*, 88 Ohio St. 34, 102 N.E. 299 (1913), paragraph two of the syllabus. But the right is limited in that it exists only as it did when the Ohio Constitution was adopted. *Stolz v. J & B Steel Erectors, Inc.*, 155 Ohio St.3d 567, 2018-Ohio-5088, 122 N.E.3d 1228, ¶ 15.

**{¶ 98}** The right to a jury trial applies in this case. *See Kneisley v. Lattimer-Stevens Co.*, 40 Ohio St.3d 354, 357, 533 N.E.2d 743 (1988) (Article I, Section 5 applies to intentional-tort actions). And the right to a jury trial includes the right to have a jury determine all questions of fact, including the amount of damages that the plaintiff may be entitled to as result of the injury. *Galayda v. Lake Hosp. Sys.,*

*Inc*., 71 Ohio St.3d 421, 425, 644 N.E.2d 298 (1994); *Sorrell*, 69 Ohio St. 3d at 422, 633 N.E.2d 504 (1994). However, the jury's authority to determine the damages award at common law has never been unchecked, either by the General Assembly or the trial court.

{¶ 99} The General Assembly has the power to alter the common law, which includes limiting the remedies available. *See Ruther v. Kaiser*, 134 Ohio St.3d 408, 2012-Ohio-5686, 983 N.E.2d 291, ¶ 14 (the legislature has the right to determine causes of action recognized under the law); *Groch*, 117 Ohio St.3d 192, 2008-Ohio-546, 883 N.E.2d 377, at ¶ 150 (the General Assembly can limit remedies for injuries under the law). This power held by the legislature, to limit remedies, existed when Article I, Section 5 was adopted. That fact is made apparent when we consider the adoption of Article I, Section 19a of the Ohio Constitution.

{¶ 100} Article I, Section 19a was adopted in 1912, the same year that Article I, Section 5 was amended to allow verdicts that are not unanimous in civil jury trials. Article I, Section 19a of the Ohio Constitution states, "The amount of damages recoverable by civil action in the courts for death caused by the wrongful act, neglect, or default of another, *shall not be limited by law*." (Emphasis added.) By its plain language, the provision means that neither the General Assembly nor the judiciary may impose a cap on total damages recoverable for wrongful death. *See Kennedy v. Byers*, 107 Ohio St. 90, 96, 140 N.E. 630, 632 (1923). But the provision also supports the conclusion that the General Assembly has the power to limit noneconomic damages for tort injuries that do not result in death. *See Gibbon v. Young Women's Christian Assn. of Hamilton*, 170 Ohio St. 280, 285, 164 N.E.2d 563 (1960). Since Brandt's claim is not for wrongful death, the General Assembly has the right to limit her damages.

{¶ 101} But even if we do not consider the General Assembly's right to dictate remedies under the common law, R.C. 2315.18 still does not violate the right to trial by jury. It is true that "it is the function of the jury to assess the damages

44

and, generally, it is not for a trial or appellate court to substitute its judgment for that of the trier of fact." *Villella v. Waikem Motors, Inc.*, 45 Ohio St.3d 36, 40, 543 N.E.2d 464 (1989). But once the jury has resolved the facts and assessed the damages in its verdict, the constitutional right is satisfied. *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 37; *Galayda*, 71 Ohio St.3d at 436, 644 N.E.2d 298 (Moyer, C.J., dissenting). Therefore, a jury's damages award is not impervious to outside interference after the jury's duties are complete. *Arbino* at ¶ 35.

{¶ 102} Prior to the adoption of Article I, Section 5, trial courts commonly questioned Ohio jury verdicts. *See Hamden Lodge No. 517, Independent Order of Odd Fellows v. Ohio Fuel Gas Co.*, 127 Ohio St. 469, 481, 189 N.E. 246(1934) ("from time immemorial the court has had and exercised the power to regulate the jury's action, at least to the extent of seeing that such action is not wholly unreasonable"). This court, consistent with our precedent, has upheld a trial court's modification of a jury verdict when that verdict cannot be sustained as a matter of law. Indeed, we have upheld remittiturs that reduce a jury's award when the trial court deems the amount excessive based on the facts found by the jury. *See Wightman v. Consol. Rail Corp.*, 86 Ohio St.3d 431, 444, 715 N.E.2d 546 (1999) (noting, though, that the successful plaintiff must consent to such an order). And we have upheld the constitutionality of a trial court's decision to grant a motion for judgment notwithstanding the verdict prior to the announcement that the court could not weigh the evidence. *Likes v. Van Dike*, 17 Ohio 454 (1848). Additionally, we have not found that awarding a plaintiff double or treble damages as required by statute violates the right to trial by jury. *See, e.g.*, R.C. 319.58 (double damages awarded to a plaintiff harmed by a person's use of false weights and measures); *see also Arbino* at ¶ 39 (listing statutes allowing treble damages). So long as the trial court does not intrude upon the jury's findings of fact, the court may amend the jury award as a matter of law, whether that is because the verdict is

not supported by sufficient evidence or because a statute requires it. *Id.* at ¶ 37; *Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, at ¶ 24; *see also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 442, 116 S.Ct. 2211, 135 L.Ed.2d 659, (1996) (Stevens, J., dissenting); *Walker v. New Mexico & S. Pacific RR. Co*, 165 U.S. 593, 596, 17 S.Ct. 421, 41 L.Ed. 837 (1897) (so long as the jury determines issues of fact and the court determines issues of law, "the procedure by which this result shall be reached is wholly within the discretion of the legislature")

{¶ 103} Here, the General Assembly determined that caps on noneconomic damages in certain situations are necessary, and it enacted R.C. 2315.18(B)(2) to change the common law accordingly. *See Stolz*, 155 Ohio St.3d 567, 2018-Ohio-5088, 122 N.E.3d 1228, at ¶ 15. The General Assembly did not force the trial court to invade the province of the jury; it required the trial court to modify the noneconomic-damages award only if the jury's award exceeded a certain amount and the plaintiff's injuries were not those exempted from caps under R.C. 2315.18(B)(3). *See Galayda* at 436 (Moyer, J., dissenting) (the trial court does not invade the province of the jury's fact-finding process when it reduces the damages award, because the statute does not apply until after the jury has completed its assigned function). Therefore, the General Assembly's modification of the remedies available for common-law torts in R.C. 2315.18(B)(2) and the trial court's compliance with that provision do not violate the right to a jury trial guaranteed by Article I, Section 5 of the Ohio Constitution.

{¶ 104} This view is not unique. Other state supreme courts have also found that caps on damages are constitutional so long as the jury award is not altered as a matter of fact but rather as a matter of law. *See Evans ex rel. Kutch v. State,* 56 P.3d 1046, 1051 (Alaska 2002); *Kirkland ex. Rel. Kirkland v. Blaine Cty. Med. Ctr.*, 134 Idaho 464, 467, 4 P.3d 1115 (2000); *Murphy v. Edmonds*, 325 Md. 342, 372-374, 601 A.2d 102 (1992); *McClay v. Airport Mgt. Servs., L.L.C.*, 596 S.W.3d 686, 696 (Tenn.2020); *Etheridge v. Med. Ctr. Hosps.*, 237 Va. 87, 95, 376

S.E.2d 525 (1989); *Horton v. Oregon Health & Science Univ., P.C.*, 359 Or. 168, 244-245, 376 P.3d 998; *Gourley ex rel. Gourley v. Nebraska Methodist Health Sys., Inc.*, 265 Neb. 918, 947, 663 N.W.2d 43 (2003); *Tam v. Eighth Judicial Dist. Court*, 131 Nev. 792, 796, 358 P.3d 234 (2015); *Judd ex rel. Montgomery v. Drezga*, 2004 UT 91, 103 P.3d 135, ¶ 35; *Phillips ex rel. Hervey v. Mirac, Inc.*, 470 Mich. 415, 419, 685 N.W.2d 174 (2004); *Wright ex rel. Green v. Colleton Cty. School Dist.*, 301 S.C. 282, 290, 391 S.E.2d 564 (1990). *But see Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*, 286 Ga. 731, 738, 691 S.E.2d 218 (2010); *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1147, 442 P.3d 509 (2019); *Moore v. Mobile Infirmary Assn.*, 592 So.2d 156, 164 (Ala.1991); *Watts ex rel. Watts v. Lester E. Cox Med. Ctrs*, 376 S.W.3d 633, 648 (Mo.2012); *Sofie v. Fibreboard Corp.*, 112 Wash.2d 636, 638, 771 P.2d 711 (1989).

{¶ 105} And though the United States Supreme Court has yet to rule on the issue, it is likely that it too would conclude that statutory caps on damages awards implemented by the court as a matter of law do not violate the right to trial by jury under the Seventh Amendment to the U.S. Constitution. *See Arkansas Valley Land & Cattle Co. v. Mann*, 130 U.S. 69, 74,  9 S.Ct. 458, 32 L.Ed. 854 (1889) (court is within its authority to set aside excessive verdict and order a new trial); *Gasperini*, 518 U.S. at 442, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (Stevens, J., dissenting) (precedent supports the conclusion that the right to a jury trial is not violated when a trial court reduces an award as a matter of law, whether that be due to a cap on damages, an unsupported verdict, or excessiveness); *Estate of Sisk v. Manzanares*, 270 F.Supp.2d 1265, 1277-1278 (D.Kan.2003).

{¶ 106} R.C. 2315.18 does not offend the right to a trial by jury under Article I, Section 5 of the Ohio Constitution. Therefore, the *Arbino* court properly applied the rational-basis test to the jury-trial, due-process, and equal-protection claims. We should reject Brandt's proposition of law challenging this court's

holding in *Arbino* and reaffirm our holding that R.C. 2315.18 is facially constitutional.

**IV. The caps on damages in R.C. 2315.18(B)(2) are not unconstitutional as applied to Brandt and similarly situated victims**

{¶ 107} Brandt argues that her reduced noneconomic-damages award violates her rights to a jury trial, to open courts, to a remedy, to due process, and to equal protection. To prevail, Brandt must prove by clear and convincing evidence that R.C. 2315.18(B)(2) is unconstitutional when applied to her particular set of facts. *Harrold*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, at ¶ 37-38. As discussed in the joint dissent, Brandt cannot demonstrate that R.C. 2315.18(B)(2) violates her right to due process. And it is also clear that Brandt cannot establish that R.C. 2315.18(B)(2) violates her rights to a jury trial, to open courts, to a remedy, or to equal protection. Like the plaintiff in *Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-118, 75 N.E.3d 122, Brandt cannot meet her burden.

*A. Brandt cannot demonstrate that as applied to her circumstances, R.C. 2315.18(B)(2) violates her right to a jury trial*

{¶ 108} Brandt argues that her right to trial by jury was violated because the jury valued her psychological injuries at $20,000,000 and the trial court's reduction of that award to $250,000 pursuant to the statutory cap intrudes on and ignores the jury's fact-finding process and renders it meaningless. But as discussed earlier, R.C. 2315.18(B)(2) does not prevent the jury from determining issues of fact. Nor does it allow the judge to substitute his or her findings for those of the jury. *See Simpkins* at ¶ 23. Rather, the General Assembly, through its right to alter the common law, requires the trial court to alter the award as a matter of law after the jury has rendered its verdict. Thus, R.C. 2315.18(B)(2) and the trial court's compliance with that statute do not violate Brandt's right to trial by jury under Article I, Section 5 of the Ohio Constitution. *Simpkins* at ¶ 27; *Arbino,* 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 37.

*B. Brandt cannot demonstrate that as applied to her circumstances, R.C. 2315.18(B)(2) violates her rights to open courts and to a remedy*

{¶ 109} Brandt argues that R.C. 2315.18(B)(2) violates her right to open courts and to a remedy under Article I, Section 16 of the Ohio Constitution. Under our precedent and understanding of "meaningful remedy," Brandt cannot demonstrate by clear and convincing evidence that her rights to open courts and to a remedy has been violated.

{¶ 110} Article I, Section 16 of the Ohio Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay." "The constitutional right to a remedy 'requires an opportunity granted at a meaningful time and in a meaningful manner.' " *Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-118, 75 N.E.3d 122, at ¶ 29, quoting *Hardy v. VerMeulen*, 32 Ohio St.3d 45, 47, 512 N.E.2d 626 (1987), overruled on other grounds by *Ruther*, 134 Ohio St.3d 408, 2012-Ohio-5686, 983 N.E.2d 291. But a plain reading of the provision "reveals that it does not provide for remedies without limitation." *Ruther* at ¶ 12. Article I, Section 16 prohibits "statutes that effectively prevent individuals from pursuing relief for their injuries." *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 44.

{¶ 111} The General Assembly has a right to alter the common law, whether that be by abolishing an action, defining an action, placing a statutory limitation on the action, or determining the remedies that may be afforded under an action. *Ruther* at ¶ 14; *Groch*, 117 Ohio St.3d 192, 2008-Ohio-546, 883 N.E.2d 377, at ¶ 150. The General Assembly has limited the amount of compensatory noneconomic damages that a plaintiff may recover under R.C. 2315.18(B)(2), but it has not "wholly den[ied] persons a remedy for their injuries." *Simpkins* at ¶ 30, citing *Arbino* at ¶ 45. The limit imposed by the General Assembly on noneconomic damages is not nominal—R.C. 2315.18(B)(2) caps noneconomic damages at

$250,000 in this situation. Also, there are other remedies available in addition to an award of noneconomic damages, like an award for unlimited economic damages under R.C. 2315.18(B)(1) and an award for punitive damages under R.C. 2315.21. Though a several-million-dollar reduction in Brandt's noneconomic-damages award is significant, we cannot say that an award of $114,250,000—the award Brandt would receive once the statutory cap is applied in this case—is not a meaningful remedy.

{¶ 112} Brandt's complaint is really that the cap in R.C. 2315.18(B)(2) is insufficient to compensate her as a minor victim of sexual abuse. Citing *Clarke v. Oregon Health Sciences Univ., P.C.,* 343 Or. 581, 175 P.3d 418, Brandt argues that the award is merely an emasculated version of the remedy that was available at common law. In *Clarke*, the Oregon Supreme Court held that under Oregon's Constitution, the state legislature is free to "modify both the form and measure of recovery for an injury, as long as it does not leave the injured party with an 'emasculated' version of the remedy that was available at common law." *Id.* at 606; *see also Horton*, 359 Or. at 220, 376 P.3d 998 ("the substantiality of the legislative remedy can matter in determining whether the remedy is consistent with the remedy clause"). In Ohio, we have not limited the General Assembly's right to modify damages for torts at common law. And our Constitution seems to allow the General Assembly to alter the remedies, especially considering Article I, Section 19a. But even if the General Assembly's ability to modify common-law remedies was limited in that it could not substantially modify the award that was available at common law, Brandt does not provide any evidence that a monetary award for noneconomic damages greater than $250,000 was available at common law.

{¶ 113} The determination of a meaningful remedy is a policy decision that must remain in the purview of the General Assembly. *See Groch*, 117 Ohio St.3d 192, 2008-Ohio-546, 883 N.E.2d 377, at ¶ 150; *Cleveland v. State*, 157 Ohio St.3d 330, 2019-Ohio-3820, 136 N.E.3d 466, ¶ 40. R.C. 2315.18(B)(2) does not deny

50

Brandt a meaningful remedy under the law; it limits one of many available remedies, and that limitation does not result in a nominal remedy. Therefore, Brandt cannot demonstrate that R.C. 2315.18(B)(2) violates her rights to open courts and to a remedy as guaranteed under Article I, Section 16 of the Ohio Constitution.

*C. R.C. 2315.18(B)(2) as applied to Brandt does not violate her right to equal protection under Article I, Section 2 of the Ohio Constitution*

{¶ 114} Brandt argues that, as applied to her circumstances, R.C. 2315.18(B)(2) violates her right to equal protection under Article I, Section 2 of the Ohio Constitution. This argument too is without merit.

{¶ 115} Article I, Section 2 of the Ohio Constitution guarantees equal protection under the laws: "All political power is inherent in the people. Government is instituted for their equal protection and benefit * * *." This clause "requires that individuals be treated in a manner similar to others in like circumstances." *McCrone*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, at ¶ 6.

{¶ 116} A statutory classification does not violate equal protection if it "bears a rational relationship to a legitimate government interest" and does not involve a suspect class or fundamental right. *Id.* at ¶ 8. Because R.C. 2315.18(B)(2) does not implicate a fundamental right, because it does not violate the right to a jury trial or the rights to open courts and to a remedy, and because Brandt does not maintain that R.C. 2315.18(B)(2) affects a suspect class, rational basis is the appropriate test. *See Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 49; *McCrone* at ¶ 8.

{¶ 117} To prevail on this claim, Brandt must demonstrate " 'either that there was no rational basis for the creation of the class itself or that those within the class are not being treated equally in the furtherance of a legitimate governmental interest.' " *Simpkins,* 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, at ¶ 48,

quoting *Morris v. Savoy*, 61 Ohio St.3d 684, 691, 576 N.E.2d 765 (1991). "A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." (Cleaned up.) *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 87 Ohio St.3d 55, 58, 717 N.E.2d 286, 290 (1999). This court will set aside legislative classifications only if they are " 'based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them.' " *Simpkins* at 48, quoting *Clements v. Fashing*, 457 U.S. 957, 963, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982).

{¶ 118} Brandt argues that R.C. 2315.18(B) creates four classes of persons distinguished by their injuries: (1) persons who have suffered catastrophic physical injuries, (2) persons who have suffered noncatastrophic physical injuries, (3) persons who have suffered catastrophic nonphysical injuries, and (4) persons who have suffered noncatastrophic nonphysical injuries. While Brandt is correct that there are four injury classifications, they are not the ones that she lists. R.C. 2315.18(B)(3) does not create classes of plaintiffs based on whether they suffered "catastrophic injuries." The term "catastrophic injury" appears nowhere in the statute.

{¶ 119} Rather, the *Arbino* court coined the term "catastrophic injury" to easily describe the injuries that were exempt from capped damages in R.C. 2315.18(B)(3). *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 47, 60-61, 72. And this court further complicated matters in *Simpkins* when we distinguished "catastrophic physical injuries" from "catastrophic nonphysical injuries." *Simpkins* at ¶ 41. The majority opinion continues with this distinction, holding that plaintiffs suffering from "catastrophic psychological injuries" are wrongfully subjected to the caps on damages in R.C. 2315.18(B)(2) in violation of due process.

{¶ 120} While the "catastrophic" distinction was seemingly harmless and appeared to be useful when this court decided *Arbino* and *Simpkins*, this description has led to some confusion and allowed litigants and courts to reframe the injuries described in R.C. 2315.18(B)(3) in a manner that the General Assembly did not adopt. *See Poteet v. MacMillan*, 12th Dist. Warren No. CA2021-08-071, 2022-Ohio-876, ¶ 17; *Torres v. Concrete Designs, Inc.*, 2019-Ohio-1342, 134 N.E.3d 903, ¶ 77 (8th Dist.) (using *Arbino*'s description of injuries as "catastrophic" to inform its view of "permanent and substantial physical deformity" in the context of R.C. 2315.18(B)(3)). The use of the term "catastrophic" has wrongly encouraged litigants and courts to place their own value judgments on plaintiffs' injuries instead of following the language in the statute.

{¶ 121} The fault is our own. By using the term "catastrophic" to characterize the types of injuries exempted from the caps on damages, we placed words in the statutory scheme that do not appear there and reinforced the wrong idea that "catastrophic" is an element of the injuries listed in R.C. 2315.18(B)(3). Because "catastrophic" appears nowhere in the statute, the "catastrophic" distinction should not be used or developed further.

{¶ 122} We must return to the plain language of the statute. The exceptions to limits on noneconomic compensatory damages in R.C. 2315.18(B)(3) apply to a person who has sustained (1) an injury resulting in "[p]ermanent and substantial physical deformity," (2) an injury resulting in "loss of use of a limb," (3) an injury resulting in "loss of a bodily organ system," or (4) a "[p]ermanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities." Anyone who experiences one of these four types of injuries is exempt from the noneconomic-damages caps. *See* R.C. 2315.18(B)(3). Anyone who has not experienced one of these types of injuries is not so exempt. R.C. 2315.18(B)(2). And it must be emphasized again that the "classification remains the same regardless of the age of

the victim and the nature of [the] tort." Joint dissenting opinion, ¶ 67. R.C. 2315.18 does not treat Brandt nor other victims of sexual assault differently from other tort victims who do not suffer from one of the four types of injuries listed above.

{¶ 123} As discussed in the joint dissent, a minor victim of sexual assault might reasonably fall into one of these categories. And contrary to the majority opinion's argument, it is not that mental health is not considered in the statute—an exemption for it is just not as obviously available and easy to obtain. "The General Assembly had a substantial interest in protecting our civil-justice system and our economy when it enacted the statue that set a cap on noneconomic damages as a means to limit the awards for injuries that are either difficult to prove or the extent of which is difficult to quantify without evidence of some physical component. This is a reasonable and legitimate government interest, and the General Assembly has not arbitrarily selected winners and losers under the statute." Joint dissenting opinion at ¶ 69. Indeed, Brandt may have fallen into one of the exempted categories of injuries due to her mental illnesses—had she made the argument. *See, e.g.*, *Ozmun v. Customer Engineering Servs., L.L.C.*, Cuyahoga C.P. No. CV 14 824745, 2015 WL 13238578 (July 31, 2015) (allowing the jury to determine whether the damages cap applied after a plaintiff offered an expert report finding that her posttraumatic stress disorder ("PTSD") was a physical, functional injury because it caused physical harm, including brain-cell damage and atrophy to the hippocampal gyrus and other areas of the brain).

{¶ 124} Thus, Brandt cannot demonstrate by clear and convincing evidence that her capped damages award violated equal protection, because R.C. 2315.18(B)(2) serves a legitimate governmental interest and there was a rational basis for the creation of the two classes—victims who fall into one of the four categories under R.C. 2315.18(B)(3) and those who do not.

*D. The majority opinion's due-process analysis is wrong and will cause chaos in our judicial system*

{¶ 125} I agree fully with the joint dissent that the majority opinion is wrong in both its due-process analysis and its holding that the cap on noneconomic damages under R.C. 2315.18 as applied to Brandt is unconstitutional. And the majority opinion's misinterpretation of our due-process jurisprudence is not only wrong, it creates chaos within our judicial system.

{¶ 126} The majority opinion's holding in this case applies not only to Brandt but to similarly situated victims. But that holding cannot be construed as a blanket prohibition against caps on damages for all minor sex-abuse victims. Rather, those victims will have to demonstrate that they are "similarly situated" to Brandt and her "extremely uncommon" case. Majority opinion, ¶ 34. This will prove to be difficult, especially considering this court's holding in *Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, in which this court held that caps on damages were constitutional as applied to a different minor victim of sexual assault; this court had rejected Simpkins's as-applied due-process challenge to R.C. 2315.18—the same argument that was raised by Brandt in this case. *See Simpkins* at ¶ 1. Under the majority opinion's decision here, courts are now left to compare whether a child victim is more similar to Simpkins, a 15-year-old girl who was raped by her pastor during two counseling sessions at her church, or to Brandt, a girl who, between the ages of 11 and 12, was raped numerous times by her friend's father while she was drugged or asleep at his home.

{¶ 127} Courts may ask: Did the victim have PTSD, anxiety, depression, trust issues with men, nightmares, and fear of the dark like Simpkins? Or did the victim have PTSD, anxiety, nightmares, difficulties sleeping, and agoraphobia like Brandt? Did the victim graduate high school, engage in sports, do well in college, and have a job, like Simpkins? Or did the victim graduate high school, have a job, get an apartment, but lose everything after falling victim to drug abuse and

addiction, which led to a suicide attempt and homelessness, like Brandt? Do we need to consider the victim's suffering in light of when the abuse occurred and when the tort action was pursued in order to better understand the victim's injuries and responses? Does it matter that a victim has had more time to reflect on how the abuse has affected his or her life? If this process seems difficult, that's because it is. And this analysis will become ever more difficult as time goes on and more child-abuse cases are plotted on this arbitrary grid created by the majority opinion.

{¶ 128} The majority opinion, through its due-process analysis, forces trial courts to engage in their own policy and value determinations in analyzing whether a victim has suffered "catastrophic psychological injuries," a term not even used in the statutory scheme. Then the majority opinion requires trial courts to compare abuse horror stories to determine whether the victim is relieved from caps on damages. This nightmare could have been avoided had the majority opinion simply applied the objective constitutional analysis that was used in *Simpkins* and left these policy considerations for the General Assembly.

### V. Conclusion

{¶ 129} Should the General Assembly revisit its decision to cap damage awards, especially in cases like Brandt's? Perhaps. But it is not the role of this court to rewrite statutes or make judicial decisions based on our preferred policy preference. As the late United States Supreme Court Justice Ruth Bader Ginsburg stated, "Judges must be mindful of what their place is in this system and must always remember that we live in a democracy that can be destroyed if judges take it upon themselves to rule as Platonic guardians." Schweitzer, *Ruth Bader Ginsburg, Wise Legal Giant*, 37 Touro L.Rev. 533, 537 (2021). The majority opinion clearly does not heed these wise words.

{¶ 130} If the cap on damages awards is to be modified or eliminated, it should be done through one of the mechanisms supported by our Constitution, like

legislative amendment, legislative referendum, or constitutional referendum. It should not be modified in the manner chosen by the majority opinion today.

{¶ 131} Because Brandt cannot demonstrate that R.C. 2315.18 is unconstitutional on its face or as applied to her, this court should hold that the cap on her noneconomic-damages award is constitutional. Because it does not do so, I must respectfully dissent.

{¶ 132} In addition, over my objection, the court did not follow the regular and orderly internal rules of operation and practice in this case due to others' seeming concerns about voting on any motion for reconsideration. Hence, my time on this case was aberrantly and improperly limited. Thus, I most humbly apologize to the citizens of Ohio that my individual dissent is not of the quality that I have come to deliver and that the public expects. This case involves many constitutional issues that deserve to be more completely analyzed and debated so that they may be resolved appropriately. The litigants deserve full and fair consideration of their case, which has been shortchanged here. We should do better.

_____

The Fitch Law Firm, John K. Fitch, and Kirstin A. Peterson; Taft, Stettinius & Hollister, L.L.P., and Stephen C. Fitch; and Center for Constitutional Litigation, P.C., and Robert S. Peck, for appellant.

Zeiger, Tigges & Little, L.L.P., John W. Zeiger, Marion H. Little Jr., and Francesca R. Boland, for appellee.

Rittgers & Rittgers and Konrad Kircher, urging reversal for amici curiae Child USA, Ohio Crime Victim Justice Center, Coalition for Children, and Crime Victims Center, Inc.

The Law Offices of Pamela J. Miller and Pamela J. Miller, urging reversal for amicus curiae American Professional Society on the Abuse of Children.

Paul W. Flowers Co., L.P.A., Louis E. Grube, and Paul W. Flowers; and Cooper & Elliott, L.L.C., and Charles H. Cooper Jr., urging reversal for amici curiae Ohio Association for Justice and American Association for Justice.

Camille M. Crary, urging reversal for amicus curiae Ohio Alliance to End Sexual Violence.

Shook, Hardy & Bacon, L.L.P., Victor E. Schwartz, Mark A. Behrens, and Cary Silverman, urging affirmance for amici curiae Chamber of Commerce of the United States of America, NFIB Small Business Legal Center, American Tort Reform Association, Coalition for Litigation Justice, Inc., and American Property Casualty Insurance Association.

Dinsmore & Shohl, L.L.P., Frank C. Woodside III, Peter J. Georgiton, and Brady R. Wilson, urging affirmance for amicus curiae Product Liability Advisory Counsel, Inc.

Dave Yost, Attorney General, Benjamin M. Flowers, Solicitor General, and Michael J. Hendershot, Chief Deputy Solicitor General, urging affirmance for amicus curiae Ohio Attorney General Dave Yost.

Calfee, Halter & Griswold, L.L.P., Jason J. Blake, and Gretchen L. Whaling, urging affirmance for amicus curiae David Goodman, former chairman of the Ohio Senate Judiciary Committee for Civil Justice.

Bricker & Eckler, L.L.P., Anne Marie Sferra, and Daniel C. Gibson, urging affirmance for amicus curiae Ohio Alliance for Civil Justice.

Tucker Ellis, L.L.P., Benjamin C. Sassé, and Elisabeth C. Arko, urging affirmance for amicus curiae Ohio Association of Civil Trial Attorneys.

_____